[870 NE2d 1132, 839 NYS2d 702]

In the Matter of GREENE COUNTY DEPARTMENT OF SOCIAL SERVICES, on Behalf of JEFFREY WARD, Respondent, v DAWN WARD, Appellant.

Argued April 24, 2007; decided June 12, 2007

**APPEARANCES OF COUNSEL**

*Law Office of Anne Reynolds Copps*, Albany (*Anne Reynolds Copps* and *Heena Shaikh* of counsel), for appellant.

*Heather K. Sheehan*, Catskill, for respondent.

**OPINION OF THE COURT**

MEMORANDUM.

The order of the Appellate Division should be affirmed, without costs.

In 2000, Dawn Ward, an unmarried registered nurse, contacted Downey Side Families for Youth with hopes of adopting a special needs child. She was presented with Jeffrey, born prematurely at 27 weeks. Although Jeffrey tested positive for cocaine and syphilis at birth, Ms. Ward was informed that his mother had not habitually used drugs and alcohol during her pregnancy, and that Jeffrey was a "quiet, gentle and pleasant child."

Jeffrey was placed with Ms. Ward on May 3, 2001, and she subsequently began receiving a $1,000 monthly subsidy to assist with his support (*see* NJ Admin Code § 10:121-1.3 ["Payments for the care and maintenance of a special needs child (adoption subsidy)"]). At the time of placement, he was three years old, weighed 25 pounds, drank from a bottle, was nonverbal, and

had been diagnosed with mild cerebral palsy and asthma. Ms. Ward enrolled Jeffrey in an early intervention program and he underwent surgeries to improve his swallowing and breathing capabilities. He began to put on weight and develop his verbal skills. On June 20, 2002, the adoption was finalized.

His emotional and mental development, however, continued to be delayed. In 2001 and 2002, Jeffrey exhibited increasingly aggressive behavior. He began eating sand and grass, biting, licking and spitting at adults, and exhibiting bouts of uncontrolled yelling. By October 2002, Jeffrey's behavior had deteriorated even further. He regressed in toileting, dressing and eating. His behavior at daycare now included head-banging, hitting and kicking other children and throwing chairs and objects. In February 2003, he was diagnosed with pervasive developmental disorder. Jeffrey's play therapist advised Ms. Ward that Jeffrey had significant neurological issues resulting from exposure to drugs and alcohol in utero. Another psychiatrist diagnosed him with attachment disorder, obsessive-compulsive disorder and autism.

Jeffrey's behavior did not improve. He injured both himself and Ms. Ward during the summer of 2003, and had frequent bouts of uncontrollable behavior. In August 2003, Jeffrey was admitted to Heely House at Parsons, a private residential treatment facility, for psychological evaluations. The results were inconclusive. Ms. Ward was advised that Jeffrey would be discharged on September 2, 2003.

On September 2, 2003, Ms. Ward went to the Greene County Department of Social Services (GCDSS) and asked for a temporary relinquishment of parental rights. When GCDSS refused to accept a temporary relinquishment, Ms. Ward decided that returning Jeffrey to her home would pose too great a risk to his and her safety, and permanently surrendered her parental rights before a Greene County Family Court judge. She subsequently relinquished the monthly subsidy she had been receiving from the State of New Jersey.

In June 2004, she received a petition seeking child support for Jeffrey. A Greene County support magistrate found Ms. Ward liable for child support as the adoptive parent of Jeffrey from the date of surrender, September 2, 2003. Family Court, affirming the findings of fact and final order of support, charged Ms. Ward with "$133.54 weekly child support for Jeffrey commencing February 4, 2005 and $10,015.50 arrears from September 2, 2003 through January 28, 2005 to be paid in $10 weekly increments." The Appellate Division affirmed.

Ms. Ward contends that she should be exempt from the child support obligation as the single "parent" of a "child born out of wedlock" and that in the alternative GCDSS should be equitably estopped from enforcing the support order. We disagree.

An adoptive parent assumes all of the liabilities of a biological parent (*see Betz v Horr*, 276 NY 83, 89 [1937]). Upon voluntary surrender, a parent retains the obligation to provide financial support for a child until he or she is adopted or turns 21 (*see* Family Ct Act § 413). Although the Social Services Law carves out a limited exception from this support requirement for children born out of wedlock to unwed mothers (*see* Social Services Law § 398 [6] [f]; 18 NYCRR 422.4), this exception does not apply to Ms. Ward. As Jeffrey was not "begotten and born" to her, she does not qualify as the "mother of a child born" out of lawful matrimony (*see* Family Ct Act § 512). Like the Appellate Division, we acknowledge the apparent harsh result in this highly unusual case, but cannot conclude that the doctrine of estoppel is applicable against the State.

Chief Judge KAYE (concurring). While I agree with the Court regarding the inapplicability of both Social Services Law § 398 and the doctrine of estoppel, the sad facts of this case prompt me to write separately regarding the failure of the Greene County Department of Social Services (GCDSS) to comply with its regulatory mandate.

A few additional details regarding Jeffrey's surrender bear mention. As noted in the Court's decision, on August 6, 2003, Jeffrey was admitted to Heely House at Parsons, a private residential treatment facility, for psychological evaluation. The results of the Heely House evaluation, however, differed from his previous diagnosis, rendering them inconclusive for the purpose of obtaining necessary treatment. Jeffrey remained at Heely House throughout August. Ms. Ward occupied these weeks with trying to secure services in anticipation of Jeffrey's return, but could not get private help and was unable to find him a position in a school, daycare center or group home.

On August 28, 2003, Ms. Ward met with the Director of Heely House, who told her that Jeffrey would be discharged on September 2, 2003. Ms. Ward requested, on the advice of Jeffrey's therapist, that he stay for additional testing as without a clear diagnosis it would be difficult for anyone to identify appropriate resources. Her request was refused. The Director said that Jeffrey was no longer "in crisis"—although she admitted that Jeffrey had knocked over a computer, pulled the phone out

of the wall and punched a worker earlier in the day—and informed Ms. Ward that if she did not take Jeffrey home, the Director would have no recourse but to call Child Protective Services.[1] She advised her to call 911 if Jeffrey became aggressive.

On September 2, 2003, Ms. Ward went to GCDSS and asked for help. She was told that a meeting with concerned parties would be arranged, but that it would take some time. GCDSS advised that in the meantime she should pick up Jeffrey from Heely House. Ms. Ward feared for Jeffrey's safety and for her own—he had injured them both during bouts of uncontrollable behavior earlier that summer, and, admittedly, nothing had changed.

Ms. Ward called her attorney, who suggested a "temporary relinquishment" of parental rights. GCDSS refused to accept a temporary relinquishment, stating that she could either pick Jeffrey up or permanently relinquish her parental rights. Although at the close of court GCDSS informed Ms. Ward's attorney that the agency had a bed for Jeffrey at a residential facility, he remained at Heely House until the additional testing recommended by his therapist (and refused to Ms. Ward) had been completed for GCDSS by the end of October.

Not having been informed that she would be pursued by GCDSS to pay for Jeffrey's maintenance, in October 2003, Ms. Ward relinquished the $1,000 per month New Jersey subsidy.[2] Eight months later she received a petition from the County seeking child support. Since that time, according to her brief, she has had her wages garnished, her bank account frozen and her vehicle impounded, and she had to sell her home.

Ms. Ward challenged the support order on the grounds that she qualified for the statutory exception, and that the GCDSS should be equitably estopped from enforcing the order. In regard to the latter, she claimed that the GCDSS had unclean hands due to its failure to provide her with support services, and that it was barred by the doctrine of laches because it failed to inform her of her financial obligation or to bring a petition for support

---

**1.** Ms. Ward was concerned about further intervention from CPS, which had been the recipient of a hotline call and opened a case against her, later deemed unfounded.

**2.** Ms. Ward testified that had she known of the support obligation, she would have attempted to have her New Jersey subsidy transferred to GCDSS. The record does not reflect that GCDSS made any effort to recover that subsidy, if indeed such relief is available.

until nine months after the surrender, at which time she had already accumulated considerable arrears.

Although Ms. Ward does not fall under the exception for children born out of wedlock, she does assume all of the rights and obligations of a biological parent in every other regard (*see Betz v Horr*, 276 NY 83, 89 [1937]). She is therefore entitled to receive the protections provided a parent surrendering a child to an authorized agency. Under New York law, a child who is not in foster care may be surrendered to an authorized agency by a written agreement "executed either before a judge of the family court or a surrogate" (18 NYCRR 421.6 [j]; *see* Social Services Law § 384 [3]). Although neither party referred the Court to the GCDSS's regulatory responsibility in this regard, 18 NYCRR 421.6 provides that in accepting a surrender, an authorized agency must "advise applicants of the obligation of social service districts to evaluate the obligation of parents of a child born in wedlock, *to contribute to the support of the child as long as the child remains a public charge*" (18 NYCRR 421.6 [c] [emphasis added]).

GCDSS accepted Jeffrey's surrender and he has remained in its care and custody. As an authorized agency or as the departmental overseer of Jeffrey's placement with an authorized agency (*see Matter of Ruth "J" v Beaudoin*, 55 AD2d 52, 53 [2d Dept 1976] ["petitioner voluntarily signed a surrender instrument . . . to an authorized agency, the Rensselaer County Department of Social Services"]; *see also* Social Services Law § 371 [10] [a]; Domestic Relations Law § 109 [7]), GCDSS must, under the applicable regulations, inform applicants for surrender of the parental support obligation.[3]

The GCDSS also apparently failed to refer Ms. Ward to mandatory preventive services or to emergency mental health services available through the Office of Mental Hygiene (*see* Mental Hygiene Law § 9.39). In *Mark G. v Sabol* (93 NY2d 710, 719 [1999]), the Court recognized the Legislature's intention to place "*increased emphasis on preventive services* designed to maintain family relationships" by creating financial incentives

---

**3.** There is another important regulatory requirement that the parties did not address. When a parent requests surrender of a child, a social services official "must determine, after appropriate consultation, if in such official's judgment, without regard to the likelihood of placing the child in an adoptive home, whether the best interests of the child will be served by a surrender" (18 NYCRR 421.6 [j]). The record is devoid of any evidence of a best interests analysis conducted prior to Jeffrey's surrender.

for social services districts, and by holding "districts account-able for meeting these standards" (*id.* at 720).[4]

In keeping with this stated goal, the regulations promulgated by the Department of Social Services provide for *mandatory preventive services* when "such services are essential to improve family relationships and prevent the placement of a child into foster care" (18 NYCRR 430.9 [c]). Preventive services are considered *essential* when:

> "(a) the child has a diagnosed or diagnosable physical, mental or emotional condition which severely impairs the child's ability to carry out daily, age-appropriate activities; or
>
> "(b) the child's behavior, although not dangerous, results in severe management problems in the home, the school or the community;
>
> "(c) the child's behavior presents a serious danger to other people or to the child himself" (18 NYCRR 430.9 [c] [5] [i]).

Preventive services include daycare services, specialized rehabilitation services (18 NYCRR 423.2 [b] [4]; [f]) and respite services for families that need provision of temporary care and supervision of children who are otherwise eligible for mandated services under 18 NYCRR 430.9 (*see* 18 NYCRR 423.2 [b] [19]; 435.3 [a]). The GCDSS apparently did not refer Ms. Ward to any of the mandatory preventive services for which Jeffrey was qualified.

In sum, I conclude on this limited record that GCDSS did not provide Ms. Ward with the notifications and access to support services she needed to make an informed decision. Although this omission was mentioned generally, Ms. Ward did not rely on any of the specific regulatory sections discussed above—so that the agency might have offered a response—nor did she challenge the surrender proceeding itself. We therefore cannot determine whether any such violations may have invalidated her relinquishment of parental rights to Jeffrey or entitled her to some other remedy. Moreover, we are unable to grant Ms.

---

4. Social Services Law § 131 (3) states that "(a)s far as possible families shall be kept together . . . and they shall be provided services to maintain and strengthen family life" (*see also* Social Services Law § 384-b [1] [a] [iii] [legislative finding that the State's "first obligation is to help the family with services to prevent its break-up" prior to instituting commitment proceedings]; Social Services Law § 409 [preventive services intended to "avert[ ] an impairment or disruption of a family"]).

Ward the only remedy she does request—that the agency be estopped from enforcing its support order. The doctrine of estoppel against a governmental entity is limited to "all but the rarest cases" (*Matter of Parkview Assoc. v City of New York*, 71 NY2d 274, 282 [1988]), circumstances not present here.

This tragic situation should never recur.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur; Chief Judge KAYE concurs in an opinion in which Judge CIPARICK also concurs.

Order affirmed, without costs, in a memorandum.