[872 NE2d 848, 840 NYS2d 736]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v VINCENT LITTO, Respondent.

Argued May 30, 2007; decided June 27, 2007

## POINTS OF COUNSEL

*Charles J. Hynes, District Attorney,* Brooklyn (*Ann Bordley* and *Leonard Joblove* of counsel), for appellant. I. Vehicle and Traffic Law § 1192 (3) applies to drivers whose intoxication was caused by a substance other than alcohol. (*People v Finnegan,* 85 NY2d 53, 516 US 919; *Majewski v Broadalbin-Perth Cent. School Dist.,* 91 NY2d 577; *Matter of Polan v State of N.Y. Ins. Dept.,* 3 NY3d 54; *Matter of Theroux v Reilly,* 1 NY3d 232; *People v Robinson,* 95 NY2d 179; *Matter of Raritan Dev. Corp. v Silva,* 91 NY2d 98; *Matter of Excellus Health Plan v Serio,* 2 NY3d 166; *Matter of Orens v Novello,* 99 NY2d 180; *People v Cruz,* 48 NY2d 419; *Otero v Town of Southampton,* 194 F Supp 2d 167.) II. The evidence before the grand jury was legally sufficient to establish defendant's guilt of driving while intoxicated and vehicular manslaughter in the second degree. (*People v Bello,* 92 NY2d 523; *People v Deegan,* 69 NY2d 976; *People v Jennings,* 69 NY2d 103; *People v Owens,* 271 AD2d 621; *People v D'Amico,* 138 AD2d 503.)

*Anthony M. Bramante,* Brooklyn, for respondent. Vehicle and Traffic Law § 1192 (3) does not apply to drivers whose alleged intoxication was caused by a substance other than alcohol. (*People v Cruz,* 48 NY2d 419; *People v Stack,* 140 AD2d 389; *People v Bayer,* 132 AD2d 920; *People v Ottomanelli,* 107 AD2d 212; *People v Weaver,* 188 App Div 395; *People v Koch,* 250 App Div 623; *People v Ardila,* 85 NY2d 846; *People v Cunningham,* 95 NY2d 909; *People v Bayer,* 132 AD2d 920; *People v Grinberg,* 4 Misc 3d 670.)

## OPINION OF THE COURT

Chief Judge KAYE.

Over the last 97 years, the Legislature has crafted and repeatedly refined statutes with the goal of removing from the road those who drive while intoxicated. This appeal centers on the phrase "driving while intoxicated" in Vehicle and Traffic Law

§ 1192 (3). Based on the language, history and scheme of the statute, we conclude that the Legislature here intended to use "intoxication" to refer to a disordered state of mind caused by alcohol, not by drugs.

## Facts

On the evening of January 13, 2004, defendant Vincent Litto, 19 years old, was driving south in Brooklyn on a four-lane road, with three passengers in his car. Traveling at 50 miles an hour on a road on which cars moved at an average speed of 30 miles an hour, defendant picked up a can of "Dust-Off" from the dashboard and sprayed it into his mouth. About 45 seconds later, he veered into oncoming traffic and crashed into a vehicle driven by Andrea Sett. One of the passengers in Sett's car, 17-year-old Kristian Roggio, was killed. Sett, another passenger, defendant and two of his passengers were injured, some seriously.

Dust-Off contains a hydrocarbon, difluoroethane, which assists as a propellant and gives a person who "huffs" it a "high."[1] According to William Closson, a forensic expert who testified before the grand jury, inhalation of this hydrocarbon initially acts as a stimulant. Within seconds, however, the person's central nervous system becomes depressed, making it difficult to perceive and react to the environment.

The People submitted 14 counts to the grand jury—one count each of manslaughter in the second degree (Penal Law § 125.15 [1]), vehicular manslaughter in the second degree (Penal Law § 125.12), criminally negligent homicide (Penal Law § 125.10), reckless endangerment in the second degree (Penal Law § 120.20), reckless driving (Vehicle and Traffic Law § 1212), operating a motor vehicle while in an intoxicated condition (Vehicle and Traffic Law § 1192 [3]), four counts of assault in the second degree (Penal Law § 120.05 [4]) and four counts of assault in the third degree (Penal Law § 120.00 [2]).

On count six, driving while intoxicated, the prosecutor charged the grand jury that:

"If you find by the credible and legally sufficient ev-

---

1. Difluoroethane is an aerosol commonly found in cleaning products for electronics, and in hair sprays and deodorants (*see* Natl Insts of Health, Household Products Database, http://householdproducts.nlm.nih.gov/cgi-bin/household/brands?tbl=chem&id=755; Everything2, "Difluoroethane," http://everything2.com/index.pl?node=Difluoroethane [last visited June 20, 2007]).

idence that on or about January 13, 2004, in the County of Kings, City and state of New York, the defendant, Vincent Litto, did operate a motor vehicle while in an intoxicated condition, you may find one count of Operating a Motor Vehicle While Under the Influence of Alcohol or Drugs."

The prosecutor instructed the grand jury that in order to charge defendant with vehicular manslaughter in the second degree, count two, it would have to find legally sufficient evidence that defendant committed the crime of criminally negligent homicide and caused the death of Kristian Roggio by operation of a vehicle in violation of Vehicle and Traffic Law § 1192 (3). The grand jury indicted defendant on all 14 counts.

Upon defendant's motion for dismissal of the indictment and inspection of the grand jury minutes, Supreme Court found the evidence before the grand jury legally sufficient on all except counts two and six. The court determined that ingestion of hydrocarbon does not fall within Vehicle and Traffic Law § 1192 (3), driving while intoxicated, and therefore could not serve as a basis for the count of vehicular manslaughter. The evidence, however, was sufficient to sustain the grand jury's conclusion that the victim's death was a direct result of defendant's reckless conduct. The Appellate Division, with one Justice dissenting, affirmed. The court reasoned that, among other amendments in the Vehicle and Traffic Law, the Legislature's 1966 enactment of a separate provision prohibiting driving while ability impaired by drugs implied that the provision prohibiting driving while intoxicated did not proscribe such conduct. We agree with the determinations of Supreme Court and the Appellate Division and now affirm. Defendant stands accused of the 12 remaining criminal charges.

## Analysis

The question posed in this case is whether a driver can be prosecuted under Vehicle and Traffic Law § 1192 (3) for "driving while intoxicated" while under the influence of a drug or other unlisted substance. The People argue that subdivision 3 includes the voluntary use of any substance or agent that can render a person "intoxicated." Defendant asserts that "intoxication" under this statute applies only to alcohol. The legislative history of the statute and its scheme reveal that the Legislature's intent has been to treat a driver's use of alcohol differently from a driver's use of drugs, and that the prohibition of

driving while intoxicated under subdivision 3 of section 1192 is part of the strategy to prevent the "drinking driver" from using the roadways.

Section 1192 of the Vehicle and Traffic Law is entitled: "Operating a motor vehicle while under the influence of alcohol or drugs." The law provides:

> "1. Driving while ability impaired. No person shall operate a motor vehicle while the person's ability to operate such motor vehicle is impaired by the consumption of alcohol.

> "2. Driving while intoxicated; per se. No person shall operate a motor vehicle while such person has .08 of one per centum or more by weight of alcohol in the person's blood as shown by chemical analysis of such person's blood, breath, urine or saliva, made pursuant to the provisions of section eleven hundred ninety-four of this article.

> "2-a. Aggravated driving while intoxicated; per se. No person shall operate a motor vehicle while such person has .18 of one per centum or more by weight of alcohol in such person's blood as shown by chemical analysis of such person's blood, breath, urine or saliva made pursuant to the provisions of section eleven hundred ninety-four of this article.

> "3. Driving while intoxicated. No person shall operate a motor vehicle while in an intoxicated condition.

> "4. Driving while ability impaired by drugs. No person shall operate a motor vehicle while the person's ability to operate such a motor vehicle is impaired by the use of a drug as defined in this chapter.

> "4-a. Driving while ability impaired by the combined influence of drugs or of alcohol and any drug or drugs. No person shall operate a motor vehicle while the person's ability to operate such motor vehicle is impaired by the combined influence of drugs or of alcohol and any drug or drugs. . . .

> "9. Conviction of a different charge. A driver may be convicted of a violation of subdivision one, two or

three of this section, notwithstanding that the charge laid before the court alleged a violation of subdivision two or three of this section . . . ."

Vehicle and Traffic Law § 114-a, in the same chapter—chapter 71 of the Consolidated Laws—as section 1192, provides: "The term 'drug' when used in this chapter, means and includes any substance listed in section thirty-three hundred six of the public health law." Public Health Law § 3306 is an extensive schedule of controlled substances. Neither difluoroethane nor the more general hydrocarbon is on the list and, therefore, defendant in this case could not have been charged under Vehicle and Traffic Law § 1192 (4).[2] A violation of Vehicle and Traffic Law § 1192 (1) is a traffic infraction; violations of subdivisions 2 through 4-a are misdemeanors.

The Court's primary goal is to interpret a statute by determining, and implementing, the Legislature's intent. Analysis begins with the language of the statute itself. Next, in construing a statute, the courts frequently "follow the course of legislation on the subject, the lineage of the act being thought to illuminate the intent of the legislature" (McKinney's Cons Laws of NY, Book 1, Statutes § 124, at 255; see Matter of Tompkins County Support Collection Unit v Chamberlin, 99 NY2d 328, 335 [2003]; Riley v County of Broome, 95 NY2d 455, 463 [2000]). The Court additionally looks to the purposes underlying the legislative scheme (see Sheehy v Big Flats Community Day, 73 NY2d 629, 634 [1989]). That method is particularly apt in this case in which the Legislature itself, over the course of the century, has repeatedly refined the statute as society has evolved, science has progressed and new problems have emerged.

### The Language of the Statute

The plain meaning of the language of a statute must be interpreted "in the light of conditions existing at the time of its passage and construed as the courts would have construed it soon after its passage" (People v Koch, 250 App Div 623, 624 [2d Dept 1937]; see People v Broadway R.R. Co. of Brooklyn, 126 NY 29, 37 [1891]).

When enacted in 1910, section 290 (3) of the Highway Law (precursor to section 1192) stated: "Whoever operates a motor

---

**2.** Subdivisions 2-a and 4-a were not in effect at the time of the incident. This appeal does not call upon us to determine the meaning of "any drug" as used in Vehicle and Traffic Law § 1192 (4-a).

vehicle while in an intoxicated condition shall be guilty of a misdemeanor" (L 1910, ch 374, § 1, at 684, amending Highway Law of 1909 tit 11 [L 1909, ch 30, 3 Birdseye, Cumming and Gilbert's Cons Laws of NY, at 3622 (2d ed)]). The law did not—as it does not today—define "intoxication." In *People v Weaver* (188 App Div 395, 399 [3d Dept 1919]), the court interpreted this statute by using "the ordinary speech of people." After citing to various dictionary definitions, the court adopted a rule that under Highway Law § 290 (3), one is "intoxicated when he has imbibed enough liquor to render him incapable of giving that attention and care to the operation of his automobile that a man of prudence and reasonable intelligence would give" (*id.* at 400). Black's Law Dictionary in 1910 defined "intoxication" as:

> "The state of being poisoned; the condition produced by the administration or introduction into the human system of a poison. But in its popular use this term is restricted to *alcoholic* intoxication, that is, drunkenness or inebriety, or the mental and physical condition induced by drinking excessive quantities of alcoholic liquors, and this is its meaning as used in statutes, indictments, etc." (Black's Law Dictionary 652 [2d ed 1910].)

In 1914, Bouvier's Law Dictionary (at 943, 1680 [3d rev ed 1914]) defined "intoxication" simply as "drunkenness," which, in turn, was defined as: "[t]he condition of a man whose mind is affected by the immediate use of intoxicating drinks." The definition in Webster's International Dictionary was: "the state of being intoxicated or drunk; inebriation; ebriety; drunkenness" (Webster's International Dictionary 782 [1908]). Webster's also notes the medical definition of "a poisoning, as by a spirituous or a narcotic substance" (*id.*). While this latter definition refers to a narcotic as an intoxicant, and some other dictionaries mention drugs,[3] the common, ordinary usage of the word "intoxication" appears to have been a condition caused by alcohol (*see People v Grinberg*, 4 Misc 3d 670, 674 [Crim Ct, Kings County 2004], quoting *Ring v Ring*, 112 Ga 854, 857, 38 SE 330, 331 [1901], in which the Supreme Court of Georgia at the start of the twentieth century analyzed the term "intoxication" as defined in several dictionaries and encyclopedias and

---

**3.** One definition of "intoxicate" in the Oxford English Dictionary, for example, is: "To stupefy or excite as with a drug or alcoholic liquor; to render unsteady or delirious in mind or feelings; to excite or exhilarate beyond self-control" (Oxford English Dictionary 432 [1901]).

concluded that "lexicographers treat 'intoxication' and 'drunkenness' as synonymous").

## The Course of the Legislation

In 1929, the statute prohibiting intoxication while driving became part of the Vehicle and Traffic Law as section 70 (5) (L 1929, ch 54; *see* King and Tipperman, *The Offense of Driving While Intoxicated: The Development of Statutory and Case Law in New York*, 3 Hofstra L Rev 541, 545 [1975]). Convictions were based on a defendant's conduct and demeanor at the time of arrest (*see People v Cruz*, 48 NY2d 419, 424 [1979]).

It was not until 1941, after years of extensive study and debate, that a major amendment permitted the admission at trial of tests for blood alcohol content (L 1941, ch 726; King at 546). Except for adding motorcycles, the prohibition against driving while intoxicated used the exact language as in 1910, and included a statement that evidence of the amount of alcohol in the blood from a test taken within two hours of arrest was admissible to prove intoxication. The test could be by medical or chemical analysis of the driver's breath, blood, urine or saliva.[4] Use of the term "intoxicated" along with the specific amounts of alcohol in the blood is evidence that the Legislature intended—and likely assumed that the Legislature in 1910 intended—that "intoxication" means that a mind is altered by an amount of alcohol.

The legislative history of the 1941 amendment supports that interpretation. Dutton S. Peterson, the sponsor, wrote to the Governor:

> "Since this bill has been approved by the highest medical authority, The American Medical Association, bar associations, police organizations, civic organizations, and automobile clubs, and because of the need for a further curb on the drinking driver, I urge that you sign this bill.
>
> "I have made an extensive study of this matter." (Letter from Assembly Sponsor, Apr. 19, 1941, Bill Jacket, L 1941, ch 726, at 39.)

---

4. Evidence of .05 of one percent or less by weight of alcohol in the blood was prima facie evidence that defendant was not in an intoxicated condition; more than .05 but less than .15 of one percent was relevant evidence of intoxication; evidence of .15 of one percent was prima facie evidence that defendant was in an intoxicated condition.

A "summary of evidence" is enclosed with that letter. Peterson notes that "different drinkers are differently affected by the same amount of alcoholic beverages," and, thus, "the only fair test of intoxication is to determine the degree of alochol [*sic*] concentration in the blood by scientific tests" (*id.* at 41). The percentages were arrived at through "careful study" and "thousands of medical tests" which were "not disputed by any reputable medical authority" (*id.* at 40, 41). Exhaustive studies were made by the National Safety Council (*id.* at 42). The American Medical Association noted the disability by prescribed drugs but used the term "intoxication" for the amount of alcohol in the blood (AMA, Report of the Committee to Study Problems of Motor Vehicle Accidents, May 1939, Bill Jacket, L 1941, ch 726, at 47-49). The Senate sponsor also sought the admission of scientific tests to prove intoxication to "cut[ ] down the number of injuries and deaths caused by the drunken drivers" (Letter from Senate Sponsor, Apr. 24, 1941, Bill Jacket, L 1941, ch 726, at 69).

Some voiced concern over the medical reliability of the tests and of the amounts of alcohol that would show intoxication. For example, one group noted that it had disapproved a previous 1938 bill because the medical profession was not "unanimous in its opinion as to the results obtainable from urine and blood tests," which, "according to some, are not determinative on the question of whether or not any *particular* person is intoxicated" (Mem of Comm on Crim Cts Law and Pro of Assn of Bar of City of NY, Bill Jacket, L 1941, ch 726, at 4-5; *see* Rep of NY County Lawyers' Assn, Comm on State Legislation, Bill Jacket, at 7; Letter from Commr of Taxation and Fin, Bill Jacket, at 25 ["while tests of the amount of alcohol in the blood may furnish valuable evidence as to intoxication, there ought to be supporting evidence to warrant a conviction"]).

This extensive documentation demonstrates that the legislative goal of strengthening the ability to prosecute for driving in an intoxicated condition was to address the drinking driver, not the driver who uses drugs. Only after studying exhaustive scientific and statistical tests confirming the validity of the percentages for blood alcohol content did the Legislature pass a law that would find intoxicated drivers liable for criminal penalties.

In 1959, section 70 (5) became section 1192 of the Vehicle and Traffic Law, and an implied consent law was added as section 1194 (L 1959, ch 775; King at 561-562 [if a driver refused to

submit to breath, blood, urine or saliva sample, the Commissioner of Motor Vehicles was required to revoke the driver's license]).

A 1960 amendment added a new offense to section 1192—driving "while ability to operate is impaired by the consumption of alcohol" (L 1960, ch 184). The new subdivision 1 was enacted so that an impaired driver—one whose blood alcohol content was .10% or more, and less than .15%—could receive a traffic infraction and not be criminally liable. The language prohibiting driving while intoxicated was kept intact, became subdivision 2 and remained a misdemeanor. Underlying the amendment were vast medical and scientific data—including laboratory and field investigations—to confirm that the amount of alcohol content would be an accurate showing of impairment (Sponsor's Mem and Appendix, Bill Jacket, L 1960, ch 184, at 1-6).

Opposed to the amendment, the New York State Automobile Association found fault with the difficulty of enforcement for such low amounts of alcohol in the blood and wondered why "little mention is made of the impairment produced by fatigue, tension, the taking of medicines or even indisposition caused by indigestion" (Letter from NY State Auto Assn, Bill Jacket, at 12). The Governor's memorandum, however, indicated that the amendment

> "provides a realistic approach towards reducing the tragic toll of death and injury caused by the drinking driver.
>
> "Existing law has proved inadequate in this regard in that it is directed towards only the most serious offender, the driver with a blood-alcohol level of at least 0.15%. In requiring that the drinking driver be classified as a criminal, present law has not proved adequate to remove the drinking driver from our highways" (Governor's Mem approving L 1960, ch 184, 1960 McKinney's Session Laws of NY, at 2002).

The Legislature was focusing on "drinking drivers," the more serious ones designated "intoxicated."

In 1966, the Legislature enacted what is now section 1192 (4), making it a misdemeanor to operate a motor vehicle while a driver's ability is impaired by the use of a drug, and defining those drugs in section 114-a of the Vehicle and Traffic Law (L 1966, ch 963, §§ 1, 4). (Those drugs are now specified in section 3306 of the Public Health Law.) The sponsor of the bill, Norman F. Lent, wrote:

"Section 1192 (2) of the Vehicle and Traffic Law as presently written pertains to the operation of a motor vehicle while under the influence of alcohol. If a person is convicted of driving while under the influence of alcohol, such person is guilty of a misdemeanor and his license may be revoked. More serious penalties result for second or more offenders within a ten year period. The bill would impose equal sanctions on persons convicted of driving while his ability to do so is impaired by the use of a drug, as that term is defined in the bill. . . .

"New York is one of the few remaining major states without a law against operating a motor vehicle while one's ability is impaired by the use of drugs and narcotics.

"Passage of such a law should also curb the present practice employed by defendants in drunk driving prosecutions of claiming they were not drunk, but 'merely' under the influence of a drug or narcotic prescribed by their physician. It is just as dangerous to operate a motor vehicle while one's ability to drive is impaired by a drug or narcotic, as it is to operate a motor vehicle while under the influence of alcohol" (Letter from Senate Sponsor, June 7, 1966, Bill Jacket, L 1966, ch 963, at 14-15).

Other letters demonstrate that the subdivision prohibiting "intoxication" did not cover the use of drugs. The Attorney General wrote that the bill would amend the statute so that "existing provisions of law relating to driving while ability is impaired by alcohol or drunken driving will be extended to apply to driving while ability is impaired by the use of a drug" (Letter from Attorney General, June 7, 1966, Bill Jacket, L 1966, ch 963, at 17). The Department of Motor Vehicles similarly recommended passage because, until this enactment, the Commissioner was unable to "take effective action" by revoking a driver's license from a driver impaired by the use of drugs, "and the police agencies were unable to convict a person who drove while so impaired" (Letter from Commr of Motor Vehs, Apr. 1, 1966, Bill Jacket, at 18).

The Department of Health recommended disapproval, for while "[t]he law has established standards for determining degrees of intoxication which can be accurately determined by chemical tests," research was necessary before standards could

be devised for ascertaining impairment by the use of drugs (Letter from Counsel for Dept of Health, Apr. 11, 1966, Bill Jacket, at 23). The Department of Mental Hygiene concurred that "[a]s contrasted with the standard of intoxication, for which presumptions are created, based on medical research, that certain proportions of alcohol in the blood have certain legal consequences, there is no comparable standard set up for various quantities of the defined drugs" (Letter from Counsel for Dept of Mental Hygiene, June 6, 1966, Bill Jacket, at 27).

Two other groups also voiced concern in holding a person criminally liable for taking a drug when the driver had no intent to become impaired (Letter from State Adm'r of Jud Conf, Apr. 12, 1966, Bill Jacket, at 21-22; Mem of Supt of NY State Police, Mar. 31, 1966, Bill Jacket, at 30). Nothing in this Bill Jacket suggests that the provision on "intoxication" included a violation for use of drugs while driving. The legislative history is conclusive that the Legislature in 1966, like previous Legislatures, intended that "intoxication" refer to inebriation by alcohol. It appears that the Legislature did not want to penalize a driver who inadvertently took prescription drugs without knowing their side effects. In addition, the Legislature sought to limit criminalization by defining the drugs prohibited.

In 1970, a new provision, now titled "Driving while intoxicated; per se," made it a misdemeanor to drive with a blood alcohol content of .15% or more (L 1970, ch 275, § 3).[5] The Governor's Program Bill stated that the "present provisions relating to driving while intoxicated" would be substantially reenacted, but the blood alcohol content for prima facie evidence would be changed (Governor's Program Bill Mem, Bill Jacket, L 1970, ch 275, at 1-2). The amendment would also "substantially reenact the present provisions governing driving while ability is impaired by the use of drugs" (id. at 2).

Further, a new section 1196 (now section 1192 [9]) would be added "to permit a conviction . . . of a violation of either subdivision 1 (driving while impaired), 2 (.15 or higher) or 3 (driving while intoxicated) of section 1192 where the original charge alleged a violation of either subdivision 2 or 3 of such section" (id.).

---

**5.** The "impaired ability" provision continued to be subdivision 1, the new per se provision became subdivision 2, the "driving while intoxicated" provision became subdivision 3, and the "drug impairment" provision became subdivision 4.

The concept of making it unlawful per se to drive with a specific blood alcohol content was patterned after programs in England and Scandinavia. The Automobile Association reversed its opposition because of new research studies, including by the Department of Transportation and the Department of Health, Education and Welfare (Mem in Support of NY State Auto Assn, Feb. 27, 1970, Bill Jacket, at 21). In his memorandum, the Governor wrote:

> "Present law provides that the presence of this level of alcohol is merely prima facie evidence of intoxication and makes the determination of intoxication one of subjective judgment. As a consequence, existing provisions have not been sufficiently effective in getting drunk drivers off the road and in deterring others from driving while under the influence of alcohol" (Governor's Mem approving L 1970, ch 275, Bill Jacket, at 24).

The word "intoxication" here is consistently synonymous with being under the influence of alcohol.

Most recently, in 2006, the Legislature amended section 1192 by adding subdivision 2-a, "Aggravated driving while intoxicated; per se"—which is violated when a person drives with a blood alcohol content of .18%—and subdivision 4-a, "Driving while ability impaired by the combined influence of drugs or of alcohol and any drug or drugs" (L 2006, ch 732, §§ 1, 2). Several related statutes were also revised. Penal Law § 125.12, vehicular manslaughter in the second degree, was amended to include subdivision 4-a, and underscores that the Legislators intended that "intoxication" should be by use of alcohol, not drugs. That section now provides:

> "A person is guilty of vehicular manslaughter in the second degree when he or she causes the death of another person, and either:
>
> "(1) operates a motor vehicle in violation of subdivision two, three, four or four-a of section eleven hundred ninety-two of the vehicle and traffic law . . . , and as a result of such intoxication or impairment by the use of a drug, or by the combined influence of drugs or of alcohol and any drug or drugs, operates such a motor vehicle . . . in a manner that causes the death of such other person . . . ."

"Intoxication" covers all the provisions including alcohol, while "impairment by the use of a drug" refers to subdivision 4

and "the combined influence" refers to subdivision 4-a of section 1192. The 2006 legislation "reflects a thorough overview of the broad scope of alcohol and drug related statutes in New York" (Senate Introducer Mem in Support of L 2006, ch 732, 2006 McKinney's Session Laws of NY, at 2183). One argument supporting subdivision 2-a was that "[t]he more intoxicated a driver is, the greater the risk of an accident. This bill appropriately addresses the seriousness of DWI and establishes graduated penalties for more intoxicated drivers . . . ." (Budget Rep on Bills, Bill Jacket, L 2006, ch 732, at 9.) Stiff penalties for "driving while intoxicated" were to deter "hard core drinking drivers" (Letter from Suffolk County Exec, Sept. 7, 2006, Bill Jacket, at 29).

## The Scheme Underlying the Statute

The legislative history not only manifests legislative intent to employ the term "intoxicated" to refer to persons inebriated by alcohol and to prevent them from driving, but also reveals a scheme by which the statute would reach that goal. This Court must determine "the consistency" of the Legislature's reaching its goal "with the purposes underlying the legislative *scheme*" (*Sheehy*, 73 NY2d at 634, quoting *Burns Jackson Miller Summit & Spitzer v Lindner*, 59 NY2d 314, 325 [1983]). "For, the Legislature has both the right and the authority to select the methods to be used in effectuating its goals, as well as to choose the goals themselves" (*id.*). *Sheehy* and *Burns Jackson* addressed private rights of action. The same reasoning applies here—the implementation of an action "should not be judicially sanctioned if it is incompatible with the enforcement mechanism chosen by the Legislature or with some other aspect of the over-all statutory scheme" (*Sheehy*, 73 NY2d at 635).

In two respects, the People's construction of Vehicle and Traffic Law § 1192 (3) is out of step with the statutory scheme. First, the scheme of section 1192 provides for different levels or kinds of proof to establish violations of the statute. Thus, a prosecutor must show impairment by alcohol to prove a violation of subdivision 1—resulting in a traffic infraction. Subdivision 1 is a lesser-included offense of subdivisions 2 and 3. Subdivisions 2 and 2-a require a showing of a specific amount of blood alcohol content to result in a per se criminal violation, whereas subdivision 3—"in an intoxicated condition"—allows for a circumstantial showing of inability to operate a motor vehicle while under the influence of alcohol. Confirming this

scheme, subdivision 9 explicitly permits a conviction under subdivision 1, 2 or 3 even when the charge alleges a violation of either subdivision 2 or 3. If subdivision 3 were now read, as the People urge, to allow for any drug to be included as part of the definition of "intoxication," then one who has committed a misdemeanor under subdivision 3 could not, in contravention of the legislative plan, be found to have committed the lesser-included offense of driving while impaired by alcohol under subdivision 1.

Second, while the legislative history from 1910 is unavailable, the history thereafter shows that the Legislature has consistently presumed that the initial statute was created to prevent drunk driving. Although, as the People argue, the goal of the Legislature may be advanced by including use of drugs in the definition of "intoxication," the Legislature has repeatedly and definitively concentrated on precise mechanisms to prevent deathly accidents related to alcohol and drugs (*see Mark G. v Sabol*, 93 NY2d 710, 722 [1999]). Including driving while under the influence of limitless "drugs" as a violation of driving while intoxicated has not been part of that mechanism.

In 1960, the Legislature added section 1192 (1) to assure that not all drivers who were under the influence of alcohol would be criminally liable. This Court determined that this subdivision and subdivision 3 were not unconstitutionally vague (*see Cruz*, 48 NY2d 419). The Court concluded that, as to subdivision 1, evident from the statutory language and scheme, the issue was "whether, by voluntarily consuming alcohol, this particular defendant has actually impaired, to any extent, the physical and mental abilities which he is expected to possess in order to operate a vehicle as a reasonable and prudent driver" (*id.* at 427). "Intoxication," the Court stated, "is not an unfamiliar concept" and is "intelligible to the average person." The standard to determine intoxication is "whether the individual's consumption of alcohol has rendered him *incapable* of employing the physical or mental abilities needed to, for instance, form a specific intent" (*id.*). These terms, the Court continued, have an accepted meaning "long recognized in law and life" (*id.* at 428). The Court thus upheld the Legislature's scheme.

The addition in 1966 of subdivision 4 demonstrates the Legislature's desire to add the use of drugs to that of alcohol for further prevention of deaths on the highway. Were drugs included in the definition for "intoxication" under subdivision 3, the Legislature would have had no reason to add another

misdemeanor. Rather, the Legislature, after careful study and debate, concluded that a driver could be convicted for impairment by drugs—and then only by explicitly enumerated drugs.

Moreover, the addition in 1970 of section 1196 (now section 1192 [9]) reaffirms that the term "intoxication" refers to the use of alcohol. In *People v Farmer* (36 NY2d 386, 390 [1975]), the Court held that, pursuant to section 1196, the defendant charged under subdivision 3 had notice that he could be convicted under subdivision 2. Although subdivisions 1, 2 and 3 "proscribe separable offenses based upon the degree of impairment caused by alcohol ingestion," the provisions "closely overlap" and are "species of the generic offense of 'Operating a motor vehicle while under the influence of alcohol' " (*id.*; *see also People v Bayer*, 132 AD2d 920 [4th Dept 1987]; *Grinberg*, 4 Misc 3d at 677). Again, the Court upheld the legislative scheme and interpreted the legislative intent to be that driving while intoxicated under subdivision 3 addresses those who drink and drive.

Only last year, focusing its attention on strengthening the statute, the Legislature added one provision to prohibit driving while using alcohol—aggravated driving while intoxicated, subdivision 2-a—and another provision to prohibit driving while using a combination of "drugs or of alcohol and any drug or drugs"—subdivision 4-a. The Legislature unambiguously employed the term "intoxicated" for the level of alcohol, and the terms "alcohol" and "drugs" for the combination.

If defendant did what the prosecution charges, then his conduct was reprehensible—his voluntary inhalation of hydrocarbon while driving resulted in the death of a young woman and serious injuries to others. Perhaps gaps exist in the law and the prosecution should not have to rely on the 12 other counts charged. However, a determination by this Court that intoxication in Vehicle and Traffic Law § 1192 (3) includes the use of any substance would improperly override the legislative policy judgment.

Accordingly, the order of the Appellate Division should be affirmed.

Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order affirmed.