*718
 
 OPINION OF THE COURT
 

 Rosenblatt, J.
 

 This appeal involves actions against New York City child welfare officials. Plaintiffs are 11 children (and the estate of a twelfth) from four families. They assert that they were dependent upon defendants’ child welfare system and that they suffered abuse or neglect in their homes or foster homes. These actions were originally part of a proposed class action suit seeking injunctive relief and damages. Plaintiffs, however, withdrew their claims against the State, along with their request for class certification and injunctive relief. In seeking to hold defendants liable under the remaining claims, plaintiffs in a series of complaints have asserted multiple causes of action under a variety of theories.
 

 At issue before us is the resolution of defendants’ motions, denominated as motions for summary judgment. They are more appropriately characterized as motions to dismiss the pleadings for failure to state a cause of action. Despite contrary nomenclature, the courts below in actuality addressed plaintiffs’ allegations in that context, as do we (see,
 
 Guggenheimer v Ginzburg,
 
 43 NY2d 268, 274-275).
 

 New York State Social Services Law
 

 Plaintiffs make claims for money damages under two distinct titles of this law: title 4 of article 6 (“Preventive Services for Children and Their Families”) and title 6 of article 6 (“Child Protective Services”).
 

 
 *719
 
 In determining whether a private right of action for money damages exists for violation of a New York State statute, this Court has established the following three-part test:
 

 “(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted;
 

 “(2) whether recognition of a private right of action would promote the legislative purpose; and
 

 “(3) whether creation of such a right would be consistent with the legislative scheme”
 
 (Sheehy v Big Flats Community Day,
 
 73 NY2d 629, 633).
 

 Title 4 of Article 6 of the Social Services Law
 

 As a part of the Child Welfare Reform Act of 1979 (L 1979, chs 610, 611), the Legislature enacted this provision. Its purpose is to:
 

 “delineate and implement a State policy of permanent homes for children who are currently in foster care or at risk of entering foster care by
 

 —placing
 
 increased emphasis on preventive services
 
 designed to maintain family relationships rather than responding to children and families in trouble only by removing the child from the family;
 

 —providing for
 
 increased monitoring
 
 of the foster care system with safeguards against abuse and for
 
 penalties where violations are found
 
 to ensure that the needs of children in foster care are appropriately met; and,
 

 —making necessary changes in adoptive services to provide appropriate homes when adoption is needed” (Governor’s Mem, 1979 McKinney’s Session Laws of NY, at 1814 [emphasis added]).
 

 The Legislature declared its intention to implement title 4 by providing added funding for preventive services
 
 (see,
 
 L 1979, ch 610, § 1). It also amended related titles to establish utilization review standards for increased monitoring of children to assure that title 4’s preventive services are carried out
 
 (see,
 
 L 1979, ch 611, § 7). Furthermore, it imposed fiscal penalties on noncompliant agencies
 
 (see,
 
 L 1979, ch 610, §§ 7, 9).
 

 The history of title 4 establishes that the Legislature intended to create financial incentives for local social services districts to provide preventive services. As Senator Joseph
 
 *720
 
 Pisani stated in his sponsoring memorandum: “This bill addresses these problems in a comprehensive manner. * * * Furthermore, the bill holds districts accountable for meeting these standards or suffer loss of reimbursement” (1979 NY Legis Ann, at 353). Similarly, Assemblyman Howard Lasher in his memorandum in support of the bill stated:
 

 “The purpose of this bill is to restructure the financing and management of child welfare services in New York State by establishing a new funding mechanism for services which are alternatives to foster care, strengthening accountability mechanisms for foster care, development and use of standardized assessment and placement tools, increased State monitoring of the necessity and appropriateness of foster placement and limits on the availability of foster care reimbursement” (1979 NY Legis Ann, at 355).
 

 We agree with plaintiffs that they are members of the class for whom title 4 was enacted, and that a private right of action for money damages could arguably promote the title’s goals. However, the third factor — the one this Court has deemed the most critical
 
 (see, Carrier v Salvation Army,
 
 88 NY2d 298) — is not satisfied. Recognition of such a private right of action under title 4 would not be consistent with the legislative scheme. The legislative approach centered on improved monitoring and on penalizing local social services districts with a loss of State reimbursement of funds for their failure to provide services or meet the standards mandated by the statute. The Legislature specifically considered and expressly provided for enforcement mechanisms. As Senator Pisani’s sponsoring memorandum makes clear, the provisions of title 4 were enacted as the “comprehensive” means by which the statute accomplishes its objectives. Given this background, it would be inappropriate for us to find another enforcement mechanism beyond the statute’s already “comprehensive” scheme.
 

 The statute’s goals are advanced by legislative action in providing and allocating appropriate funding. If the statute were opened to private causes of action for money damages the funding scheme would be affected, perhaps significantly. Allocations of money and government resources would be rechanneled, no longer to be based on administrative judgments, but driven, at least in part, by tort law principles. The Legislature has the authority to determine whether opening the statute to
 
 *721
 
 private tort law enforcement would advance the objectives of child and family welfare or skew the distribution of resources. Considering that the statute gives no hint of any private enforcement remedy for money damages, we will not impute one to the lawmakers.
 

 Title 6 of Article 6 of the Social Services Law
 

 This enactment was one of several legislative initiatives to counter the breakdown in the child protective system that was brought to the Legislature’s attention in the late 1960s (Report of Assembly Select Comm on Child Abuse, at ii [1972]). The purpose of title 6, as stated in its preamble, is:
 

 “to encourage more complete reporting of suspected child abuse and maltreatment and to establish in each county of the state a child protective service capable of investigating such reports swiftly and competently and capable of providing protection for the child or children from further abuse or maltreatment and rehabilitative services for the child or children and parents involved” (Social Services Law § 411).
 

 In seeking to encourage early reporting of child abuse, the Legislature determined that immunity from civil and criminal liability was indispensable. Protection from liability would remove “the fear of an unjust lawsuit for attempting to help protect a child” (Report of Assembly Select Comm on Child Abuse, at 33 [1972]; see
 
 also,
 
 Budget Report on Bills, Bill Jacket, L 1973, ch 1039 [“Requires designated persons to report suspected cases of child abuse or maltreatment immediately
 

 * ** * (and) permits any person to make such a report and provides immunity for all acting in good faith.”]).
 

 Section 419, as it existed at the relevant time, contained the following immunity provision:
 

 “Any person, official, or institution participating in good faith in the providing of a service pursuant to section [424 of the Social Services Law], the making of a report, the taking of photographs, or the removal or keeping of a child pursuant to this title shall have immunity from any liability, civil or criminal,
 
 that might otherwise result
 
 by reason of such actions” (emphasis added).
 

 Plaintiffs assert an implied private right of action for money damages for defendants’ alleged violations of Social Services Law § 424. They rely on the above-quoted immunity provision
 
 *722
 
 of Social Services Law § 419 to support their contention that such an action exists for a failure to comply with the provisions of title 6, including Social Services Law § 424.
 

 Section 419’s legislative history, however, reveals that it was intended to provide immunity only with respect to civil or criminal liability that would
 
 otherwise result
 
 from acts taken by persons, officials or institutions in a good faith effort to comply with specific provisions of the Social Services Law
 
 (see, Straton v Orange County Dept. of Social Servs.,
 
 217 AD2d 576, 577;
 
 Dagan v Brookdale Hosp. Med. Ctr.,
 
 202 AD2d 385). There is no indication that section 419 was intended to apply to failures to provide the services required by the Social Services Law.
 

 Indeed, the Legislature specifically created a private right of action in the very next section. Social Services Law § 420 provides for criminal and civil liability for the willful failure of persons, officials or institutions required by title 6 to report cases of “suspected child abuse or maltreatment.” If the Legislature had intended for liability to attach for failures to comply with other provisions of title 6, it would likely have arranged for it as well.
 

 The enforcement mechanisms of title 6 have not escaped legislative review. In fact, the Legislature’s subsequent amendments to the enforcement scheme of title 6 evinced an emphasis on funding mechanisms and the development of performance standards by the State Department of Social Services
 
 (see,
 
 L 1988, ch 707; L 1995, ch 83, §§ 229, 231; L 1998, ch 58, pt C, § 87;
 
 see also,
 
 Mem of State Executive Dept. 1988 McKinney’s Session Laws of NY, at 2138-2140). The Legislature specifically concentrated on the statutory scheme’s enforcement provisions, which, except for the unique motivations that underlie Social Services Law § 420, have never included private rights of action for money damages. In sum, we conclude that a private right of action for money damages cannot be fairly implied from title 6 of the Social Services Law
 
 (see, Sheehy v Big Flats Community Day,
 
 73 NY2d, at 633,
 
 supra).
 

 Plaintiffs’ Due Process Claims
 

 Plaintiffs assert that when they were placed in foster care they remained within the ambit of the defendants’ custodial responsibility, where defendants were obligated to take supervisory and interventive steps to keep them free from harm. They further allege that while they were in foster care defendants failed to accord them the protective services to
 
 *723
 
 which they were entitled under titles 4 and 6 of article 6 of the Social Services Law. Based on these claims, plaintiffs contend that they have been denied due process of law. Plaintiffs apparently do not include non-foster care children within this claim.
 
 [1]
 

 Plaintiffs have asserted violations of the substantive component of the Due Process Clause of the Fourteenth Amendment of the United States Constitution — sometimes called substantive due process — as well as violations of the procedural component of the Due Process Clause. In general, procedural due process claims challenge the procedures used by the government in effecting a deprivation of a right, whereas substantive due process claims challenge the action itself.
 
 [2]
 
 Thus, substantive due process implicates “the essence of state action rather than its modalities.”
 
 [3]
 
 In one commentator’s formulation, “ [procedural due process differs from substantive due process by focusing not on what a person has been deprived of, but rather on how the deprivation was accomplished.”
 
 [4]
 

 The classic procedural due process case arises when the government acts to deny or curtail someone’s life, liberty or property interest and defends its action by asserting that it employed fair procedures in furtherance of a legitimate governmental objective (see,
 
 e.g., Schall v Martin,
 
 467 US 253 [pretrial juvenile detention];
 
 Vitek v Jones,
 
 445 US 480 [prison to mental hospital transfer];
 
 Addington v Texas,
 
 441 US 418 [civil commitment]). That is not the case before us.
 

 Here, deprivation or denial is not the governmental goal. This case does not involve an attempt by the government to deprive the plaintiffs of a right that carries with it a predeprivation procedure. The government may not decide to deny a foster child’s safety or entitlements and seek to justify the denial by showing that its processes or procedures were fair. No amount of procedure can justify the wrongful denial of an entitlement. Moreover, merely asserting a denial of a statutory
 
 *724
 
 entitlement does not make out a claim of procedural due process. As the United States Supreme Court held in
 
 Olim v Wakinekona, “[p]
 
 rocess is not an end in itself’ (461 US 238, 250;
 
 see also, Hewitt v Helms,
 
 459 US 460, 469). We conclude that plaintiffs have not adequately pleaded a violation of procedural due process, and that those causes of action should be dismissed.
 

 Plaintiffs also assert violations of the substantive component of the Due Process Clause of the United States Constitution. Three United States Supreme Court cases are critical to our treatment of this issue. In
 
 Estelle v Gamble
 
 (429 US 97, 104) the Court held that the State owes a duty to those whom it has placed in its custody, so that when a prisoner demonstrates that the State exhibited “deliberate indifference” to the prisoner’s medical needs, the Constitution’s guarantees against cruel and unusual punishment are violated. Although
 
 Estelle
 
 was an Eighth Amendment case, the Supreme Court has characterized the government’s deliberate indifference toward the prisoner in
 
 Estelle
 
 as a violation of substantive due process
 
 (see, DeShaney v Winnebago County Dept. of Social Servs.,
 
 489 US 189, 198, n 5, supra;
 
 Whitley v Albers,
 
 475 US 312, 326-327).
 

 Six years later, the Supreme Court in
 
 Youngberg v Romeo
 
 (457 US 307, 315) addressed the government’s obligations to a person whom it committed to a facility for the mentally retarded. The Court stressed that people who are in the State’s custody are dependent on the government for their basic needs (457 US, at 324). The Supreme Court held that inasmuch as Romeo was not a prisoner, the
 
 Estelle
 
 “deliberate indifference” standard was inappropriate. The Court ruled that Romeo — a person involuntarily committed and thereby dependent on the government for basic needs — was “entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.” (457 US, at 322). The Court stated that as to persons so confined the State owes a duty to accord such services as are necessary to insure their reasonable safety. The litigants in
 
 Romeo
 
 also agreed that the State owed a duty to provide such persons “adequate food, shelter, clothing, and medical care”
 
 (Youngberg v Romeo,
 
 457 US, at 324). In such a setting an actionable claim is made out if and when a decision by the State through its professional administrators with respect to such services “is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person
 
 *725
 
 responsible actually did not base the decision on such a judgment”
 
 (supra,
 
 457 US, at 323).
 

 Estelle
 
 and
 
 Romeo
 
 are the two primary cases in which the Supreme Court recognized monetary damage claims based on the substantive component of the Due Process Clause. Neither involved children in foster care. Thereafter, in 1989, the United States Supreme Court decided
 
 DeShaney v Winnebago County Dept. of Social Servs.
 
 (489 US 189), the only case in which it touched upon the issue of substantive due process in the context of children in foster care. The Court held that a child who suffered harm while in the custody of his father has no claim based on the substantive component of the Due Process Clause. The Court, however, in a footnote, stated: “Had the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect” (489 US, at 201, n 9). The Court then cited several cases by way of illustration, but expressly disclaimed any view on the validity of that analogy.
 

 In the case before us, the original complaint was drafted before the Supreme Court decided
 
 DeShaney.
 
 It was drawn as a putative class action that included various plaintiffs, some of whom were allegedly harmed while in foster care, others while living with their parents. Plaintiffs commenced this litigation employing an array of claims designed to address numerous facets of the child welfare system and to test the availability of a host of remedies, including various forms of injunctive relief and putative class certification. The complaints had been conceived and drawn with a broad thrust that did not contemplate or take aim at the more specific and essential elements that would enable them to withstand a motion to dismiss for failure to articulate a substantive due process violation. Although the complaints are abundant with allegations relating to defendants’ failure to provide plaintiffs with family social services, we are left on this appeal only with the sufficiency of the complaints insofar as they seek monetary damages. In addressing plaintiffs’ claims for money damages pursuant to the substantive component of the Due Process Clause, the Appellate Division determined, and we agree, that the complaints did not meet the
 
 Estelle
 
 “deliberate indifference” standard. The Appellate Division, however, did not address the
 
 Romeo
 
 “professional judgment” standard.
 

 
 *726
 
 Even though in our view the
 
 Romeo
 
 standard, is a better fit,
 
 [5]
 
 we conclude that plaintiffs have not articulated a cause of action under
 
 Romeo.
 
 In
 
 Romeo
 
 and
 
 Estelle
 
 the United States Supreme Court identified a narrow set of constitutional entitlements to basic necessities, arising out of conditions of total dependence in which the State itself had placed those institutionalized plaintiffs.
 
 Romeo
 
 and
 
 Estelle,
 
 however, do not support any substantive due process right to monetary redress for the defendants’ alleged failure to provide the array of social services claimed by plaintiffs here. Moreover, the crux of the plaintiffs’ complaints here is the defendants’ alleged failure to provide protective and preventive services to the plaintiffs’ families in order to avoid foster care placement and keep them at home in a safe environment, or to minimize their stay in foster care through family rehabilitation services, thereby expediting their return to a safe home environment. Under
 
 De-Shaney,
 
 however, any substantive due process rights of foster children cannot be extended to entitlement to preventive and protective services before placement in care, or to family social services during placement. The allegations of harm or denial of needed medical or other services to the children while in foster care are very much incidental to the foregoing primary complaints that are pleaded, and since plaintiffs never articulated a violation of the
 
 Romeo
 
 standard of care, an independent claim for money damages for injuries in foster care based on such omissions cannot be implied. Considering that this Court has never had occasion to deal with the contours of the substantive component of the Due Process Clause in the context of a child welfare case, neither the parties nor the courts below had a precedential basis on which to proceed. We therefore affirm the dismissal of those claims with leave to re-plead.
 

 Common-Law Negligence
 

 In their briefs, the parties have addressed the viability of the so-called common-law tort causes of action. These causes of action are not pleaded separately, but are intertwined with a plethora of other causes of action and theories. Indeed, the complaints do not identify any common-law duties claimed to be owed plaintiffs — as distinguished from the alleged breach of other governmental responsibility to furnish protective and
 
 *727
 
 preventive services, which form the primary bases for these actions.
 

 We recognize, of course, that pleadings should be construed liberally, but it would be improvident for us to attempt to isolate and identify any common-law claims and theories asserted on plaintiffs’ behalf. Although we do not as a matter of law rule out the possibility of any such common-law claims, we conclude that no viable common-law claim has been pleaded and we therefore grant plaintiffs leave to replead. The parties’ remaining contentions are without merit.
 

 Accordingly, the order of the Appellate Division should be modified, without costs, by dismissing the remaining causes of action, and, as so modified, affirmed. The certified question should be answered in the negative.
 

 Smith, J. (concurring). I concur generally with the decision of the majority which gives the plaintiffs an opportunity to re-plead the substantive due process and common-law causes of action. Because of the myriad allegations in the complaints, however, I would not foreclose an opportunity for the plaintiffs to plead a new cause of action, alleging violations of specific provisions of the Adoption Assistance and Child Welfare Act of 1980 (42 USC §§ 620-628, 670-679a) and of the Federal Child Abuse Prevention and Treatment Act (CAPTA; 42 USC §§ 5101-5106). Permitting the repleading of a violation of specific statutory provisions is consistent with the statements of the Supreme Court of the United States in
 
 Blessing v Freestone
 
 (520 US 329, 345, 346) that “[w]e do not foreclose the possibility that some provisions of Title IV-D [provisions of the Social Security Act which generally deal with cooperative State and Federal child welfare programs] give rise to individual rights” and “we leave open the possibility that Title IV-D may give rise to some individually enforceable rights” (see,
 
 Marisol A. v Giuliani,
 
 929 F Supp 660,
 
 affd [appeal of class certification only]
 
 126 F3d 372).
 

 While I agree that the common-law claims must be repleaded, particularly to clarify plaintiffs’ contentions, I do not agree that no viable common-law claims have been stated (see,
 
 Bartels v Westchester County,
 
 76 AD2d 517;
 
 see also, e.g., Mammo v State,
 
 138 Ariz 528, 675 P2d 1347;
 
 Department of Health & Rehabilitative Servs. v Yamuni,
 
 529 So 2d 258 [Fla];
 
 Brodie v Summit County Children Servs. Bd.,
 
 51 Ohio St 3d 112, 554 NE2d 1301;
 
 Jensen v Anderson County Dept. of Social Servs.,
 
 304 SC 195, 403 SE2d 615;
 
 Gonzalez v Avalos,
 
 866 SW2d 346
 
 *728
 
 [Tex];
 
 Sabia v State,
 
 164 Vt 293, 669 A2d 1187;
 
 Turner v District of Columbia,
 
 532 A2d 662 [DC App]). While this litigation is old, it is important that the claims of the plaintiffs against the municipality be clearly focused.
 

 Chief Judge Kaye and Judges Bellacosa, Levine, Ciparick and Wesley concur with Judge Rosenblatt; Judge Smith concurs in result in a separate opinion.
 

 Order modified, etc.
 

 [1]
 

 .
 
 See, DeShaney v Winnebago County Dept. of Social Servs.,
 
 489 US 189, 201.
 

 [2]
 

 .
 
 See, Griffin v Strong,
 
 983 F2d 1544, 1547 (10th Cir);
 
 Sierra Lake Reserve v City of Rocklin,
 
 938 F2d 951, 956-957 (9th Cir),
 
 cert granted, judgment vacated and case remanded
 
 506 US 802,
 
 opn vacated in part
 
 987 F2d 662.
 

 [3]
 

 .
 
 See, Amsden v Moran,
 
 904 F2d 748, 753 (1st Cir),
 
 cert denied
 
 498 US 1041.
 

 [4]
 

 . Note,
 
 Forum Non Conveniens in the Absence of an Alternative Forum,
 
 86 Colum L Rev 1000, 1015 (1986).
 

 [5]
 

 .
 
 See, e.g.,
 
 Kearse,
 
 Abused Again: Competing Constitutional Standards for the State’s Duty to Protect Foster Children,
 
 29 Colum J L & Soc Probs 385 (1996).