Weisbrod-Moore v Cayuga County (2025 NY Slip Op 00903)

Weisbrod-Moore v Cayuga County

2025 NY Slip Op 00903

Decided on February 18, 2025

Court of Appeals

Troutman

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on February 18, 2025

No. 7

[*1]Jackie Weisbrod-Moore, Appellant,

v

Cayuga County, Respondent, et al., Defendants.

Jeffrey M. Herman, for appellant.

Matthew J. Larkin, for respondent.

Phillip W. Young, for amicus curiae City of New York.

County of Westchester, New York State Trial Lawyers Association, amici curiae.

TROUTMAN, J.

Today we hold that municipalities owe a duty of care to the children the municipalities place in foster homes because the municipalities have assumed custody of those children. As a result, we reverse the decision of the Appellate Division.

I.

Plaintiff, formerly a child in foster care, commenced this action pursuant to the Child Victims Act (see CPLR 214-g) against defendant Cayuga County and "Does 1-10," who she alleged were "persons or entities with responsibilities for [p]laintiff's safety, supervision and/or placement in foster care." According to the complaint, the County placed plaintiff in foster care in 1974, when she was three months old. While in the foster home selected by the County, plaintiff allegedly suffered horrific abuse. Plaintiff alleged that her foster parent sexually abused her over the course of approximately seven years, beginning when she was 18 months old and continuing until she was eight years old. The foster parent allegedly coerced plaintiff's compliance with the sexual abuse by inflicting severe physical abuse, resulting in plaintiff sustaining broken bones and a head wound.

In asserting that the County was liable for negligence, plaintiff alleged, among other things, that the County had a duty to exercise reasonable care in selecting, retaining, and supervising her foster placement, and that the County breached this duty by placing her in the foster home and failing to adequately supervise her placement to ensure that she was safe under her foster parents' care.

In lieu of answering, the County moved to dismiss the complaint pursuant to CPLR 3211 (a) (7). The County argued that the complaint failed to state a cause of action inasmuch as plaintiff failed to plead that the County owed her a special duty. Alternatively, the County asserted that it was immune from suit because it was engaged in a governmental function. Plaintiff opposed, asserting that the County's duty arose from its "custodial relationship" with plaintiff and that the governmental function immunity defense did not apply.

Supreme Court denied the County's motion. The court acknowledged that the County's statutory obligations did not give rise to a private cause of action pursuant to Mark G. v Sabol (93 NY2d 710 [1999]) and correctly recognized that plaintiff was asserting only a claim for common-law negligence, not a statutory claim. With respect to common-law negligence, the court concluded that, because plaintiff was in the custody of the County, the case was distinguishable from Maldovan v County of Erie (188 AD3d 1597 [4th Dept 2020], affd 39 NY3d 166 [2022]).

The Appellate Division reversed and granted the County's motion to dismiss the complaint (see 216 AD3d 1459 [4th Dept 2023]). Relying on our cases involving the special duty doctrine (see e.g. McLean v City of New York, 12 NY3d 194 [2009]; Cuffy v City of New York, 69 NY2d 255 [1987]), the Appellate Division determined that, because the County was acting in a governmental capacity in administering the foster care system, plaintiff was required to plead and prove that the County owed her a special duty under one of three recognized categories (see 216 AD3d at 1460). The Court concluded that plaintiff failed to establish that any of the three special duty categories applied (see id.).

We granted plaintiff leave to appeal (see 41 NY3d 908 [2024]) and now reverse.

II.

Under common-law negligence principles, the plaintiff must establish the existence of a duty of care owed to them by the defendant (see Sanchez v State of New York, 99 NY2d 247, 252 [2002]; see Pulka v Edelman, 40 NY2d 781, 782 [1976]). "The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the courts" (Sanchez, 99 NY2d at 252; see Davis v South Nassau Communities Hosp., 26 NY3d 563, 572 [2015]).

We have held that a municipality engaged in a governmental function may be liable in negligence where "the facts demonstrate that a special duty was created" (Ferreira v City of Binghamton, 38 NY3d 298, 310 [2022] [internal quotation marks and citation omitted]; see Applewhite v Accuhealth, Inc., 21 NY3d 420, 426 [2013]). The special duty doctrine was developed as a mechanism " 'to rationally limit the class of citizens to whom the municipality owes a duty of protection' " (Ferreira, 38 NY3d at 310, quoting Kircher v City of Jamestown, 74 NY2d 251, 258 [1989]). We have explained that

" '[a] special duty can arise in three situations: (1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition' " (Tara N.P. v Western Suffolk Bd. of Coop. Educ. Servs., 28 NY3d 709, 714 [2017], quoting Applewhite, 21 NY3d at 426).[FN1]

Although the parties do not dispute that, in administering the foster care system, the County was engaged in a governmental function, plaintiff contends that she was not required to establish the existence of a special duty in light of the County's custody of her while in foster care [FN2]. Plaintiff asserts that the three-category special duty rule was developed by this Court for circumstances other than persons in governmental custody, which is a pre-existing and well-established category of common-law special relationships. We agree.

We have consistently recognized that the government owes "a duty of care to safeguard" those in its custody, including incarcerated persons, juveniles in delinquency facilities, and schoolchildren (Villar v Howard, 28 NY3d 74, 80 [2016]; see Sanchez, 99 NY2d at 252-253; Pratt v Robinson, 39 NY2d 554, 560 [1976]; Flaherty v State of New York, 296 NY 342, 346 [1947]; see also A.J. v State of New York, 231 AD3d 237, 239 [3d Dept 2024]). This duty stems from common-law principles and is not restricted to cases where the government has direct physical control (see e.g. Paige v State of New York, 269 NY 352, 356 [1936] [private entity charged by the State with running a reformatory could be liable as State agents for negligence of the employees of the private company])[FN3]. Of course, the government's duty to those in its custody "does not mandate unremitting surveillance in all circumstances, and does not render [the government] an insurer of . . . safety" (Sanchez, 99 NY2d at 256). The government's duty is only to protect those in its custody from "risks of harm that are reasonably foreseeable" (id. at 253). Such risks extend to reasonably foreseeable harm inflicted by non-governmental third parties (see id. at 253-254; Pratt, 39 NY2d at 560). The principal rationale for recognizing a duty of care in our governmental custody cases is that, by taking a person into custody, the government necessarily limits that person's avenues for self-protection (see Sanchez, 99 NY2d at 252). Particularly, with respect to children in its custody, the government's duty derives from the fact that [*2]the government, by assuming custody over the child "effectively takes the place of parents and guardians" (Mirand v City of New York, 84 NY2d 44, 49 [1994]; see Pratt, 39 NY2d at 560).

Foster children are no exception. By assuming legal custody over the foster child, the applicable government official steps in as the sole legal authority responsible for determining who has daily control over the child's life [FN4]. We thus hold that a municipality owes a duty to a foster child over whom it has assumed legal custody to guard the child from "foreseeable risks of harm" arising from the child's placement with the municipality's choice of foster parent (Sanchez, 99 NY2d at 255).

Consistent with our governmental custody cases, the Second and Third Departments have held that, by assuming legal custody over a foster child, a municipality necessarily owes a duty to the child greater than that owed to the public generally, and thus, it is unnecessary for the child to plead or prove that one of the three special duty categories applies (see e.g. Adams v Suffolk County, — AD3d &mdash, 2024 NY Slip Op 05428 [2d Dept 2024]; Grabowski v Orange County, 219 AD3d 1314, 1314-1315 [2d Dept 2023]; Grant v Temple, 216 AD3d 1351, 1352 [3d Dept 2023]; Bartels v County of Westchester, 76 AD2d 517, 519, 521-522 [2d Dept 1980]; see also A.J., 231 AD3d at 239 [juvenile in a delinquency facility was not required to plead one of the three bases for special duty because he was in the State's custody]).

The County, in contrast, argues that there is no common-law special relationship arising out of a municipality's assumption of custody over a foster child. The County instead argues that a plaintiff is required to establish the existence of a special duty under one of the three categories. The Fourth and First Departments have adopted this view (see Q.G. v City of New York, 222 AD3d 443, 444 [1st Dept 2023]), relying heavily on our decision in McLean (12 NY3d 194 [affirming dismissal for lack of special duty where the plaintiff alleged that her infant daughter was injured at a daycare that was allowed to remain on State's list of approved childcare facilities]), and our special duty case law generally (see e.g. Maldovan, 39 NY3d 166 [affirming dismissal for lack of special duty where decedent's brother alleged that County failed to protect decedent from her abusive family members]).

Such reliance, however, is misplaced. The myriad of special duty cases identified by the dissent and the County all suffer from the same obvious defect: none of the plaintiffs in those cases were in the custody of the government, so there was no common-law special relationship established. The injured child in McLean was in the care and custody of her mother (see 12 NY3d at 198-199). Similarly, the decedent victim in Maldovan was in the care and custody of her abusive family members (see 39 NY3d at 170; see also O'Connor v City of New York, 58 NY2d 184, 187 [1983] [persons injured by a gas explosion alleging negligence against the city]; Riss v City of New York, 22 NY2d 579, 581 [1968] [woman who informed law enforcement of a threat against her alleging negligence against the police]; Steitz v City of Beacon, 295 NY 51, 54 [1945] [railroad employee alleging negligence against his employer]). Far from "ignor[ing] our precedent" (dissenting op at 4), our decision simply acknowledges and gives meaning to our governmental custody line of cases—a well-established theory of common-law liability that falls outside the special duty doctrine [FN5]. Indeed, Maldovan expressly left open the possibility that the special duty rule may not apply [*3]"where the injured party [is] a child . . . incapable of pursuing other avenues of protection and [without] a competent adult family member advocating on their behalf" (39 NY3d at 174). Moreover, this is not a case where the government's duty to plaintiff " 'was neither more nor less than its duty to any other . . . child in need of' foster care" (dissenting op at 8, quoting McLean, 12 NY3d at 201). By assuming custody of plaintiff, and thus assuming the authority to control where and with whom plaintiff lived, the County necessarily assumed a duty to her beyond what is owed to the public generally.

Neither the County nor the dissent explain how our governmental custody cases were somehow eclipsed by the special duty doctrine. Rather, they attempt to distinguish our custody cases by asserting that a duty can be imposed on the government only where it assumes physical custody over an individual as opposed to legal custody. We do not consider this distinction compelling or dispositive.

In Pratt, we explained that a public school district owes a duty to its students that is "coextensive with and concomitant to its physical custody of and control over the child" (Pratt, 39 NY2d at 560). But Pratt does not stand for the proposition that a duty can only arise from physical custody. On the contrary, we explained that the school's liability ceases when its physical custody of the child ceases "because the child has passed out of the orbit of its authority in such a way that the parent is perfectly free to reassume control over the child's protection" (id.). Implied in our reasoning was the understanding that a child's parents retain legal custody over the child even while that child is in the school setting. Conversely, although a foster child may leave the municipality's physical custody once placed in a foster home, that child does not return to the legal custody of any parental authority; legal custody remains with the municipality (see Social Services Law § 383 [2]; see also Matter of Michael B., 80 NY2d 299, 309 [1992] ["(l)egal custody of a child in foster care remains with the agency that places the child, not with the foster parents"]; Matter of Spence-Chapin Adoption Serv. v Polk, 29 NY2d 196, 202 [1971] [foster parents never have "true custody"]). Thus, the child never truly passes out of the orbit of the municipality's authority. A municipal defendant cannot simply shirk liability arising from its exercise of that broad authority by placing the child in a different physical setting (see Moch Co. v Rensselaer Water Co., 247 NY 160, 167 [1928] ["The hand once set to a task may not always be withdrawn with impunity though liability would fail if it had never been applied at all"]). While the foster parent has physical custody, the municipality has a continuing and independent responsibility to safeguard the child from foreseeable harm that may result from the foster placement it selected.

We also do not consider the distinction between physical and legal custody compelling in light of the negligence plaintiff alleged. Here, plaintiff alleged that the County was negligent in its placement of her and its supervision of that placement. In other words, plaintiff alleged that the County's negligent act was giving her foster parents physical custody of her. Exercising a degree of care in selecting and supervising plaintiff's foster placement is exactly the type of duty that flowed from the kind of custody and control the County possessed over plaintiff. The dissent's suggestion that the County did not exert a great enough "level of control" over plaintiff's care to be fairly exposed to liability strains credulity (dissenting op at 11, 12). Municipalities assert a great deal of control in the selection and monitoring of the physical environment in which a foster child, who has been removed from the care and custody of their parents, is placed. There is no question that the government should be required to make these decisions with due care. After all, the government removes a child from the care and custody of their parents with the intention of placing that child in a safe environment [FN6]. The fact that the County did not exert complete control over plaintiff's day to day [*4]life did not relieve the County of its duty, in exercising its legal custody over the plaintiff, to place her in a safe foster home and supervise that home for foreseeable risks. Foster children, minors over whom the government has taken custody and control, are incapable of removing themselves from the environment in which the government has placed them. Although the type of custody may inform the nature and scope of the government's duty (see Sanchez, 99 NY2d at 252), it does not by itself dictate whether the government has a duty in the first instance. Unlike the dissent, we are confident that our courts are capable of defining the nature and scope of the government's duty to those in its custody, as they have done for decades.

Finally, while we appreciate the concern over the financial impact on municipalities that liability may pose in these types of cases, we have consistently held the government may be held liable for the foreseeable injuries inflicted on those in its custody and control. The dissent laments that our decision will unleash a "crushing burden" on municipalities and impede the ability of municipal officials to perform its responsibilities (dissenting op at 16). The dissent's warnings, however, are premised on a fundamental misconstruction of our holding. The duty we announced today does not require government employees to "monitor foster children 24 hours a day" and take responsibility for "harm inflicted by third parties on foster children" (dissenting op 12, 15 [emphasis omitted])[FN7]. Our holding merely requires that municipalities, in making decisions about the child's placement, make those decisions with reasonable care. Contrary to the foreboding picture painted by the dissent, recognition of a duty on the part of municipalities administering foster care systems does not impart strict liability upon the government. The dissent's fears in this respect unnecessarily conflate the existence of a duty with breach of that duty. "Like other duties in tort," however, "the scope of the [government's] duty to protect [foster children will be]

limited to risks of harm that are reasonably foreseeable" (Sanchez, 99 NY2d at 253 [emphasis added]).

In light of our holding, we do not address plaintiff's remaining argument as to whether the complaint sufficiently sets forth one of the three special duty categories. We further conclude that resolution of the County's "argument that [it] is entitled to governmental [function] immunity—an affirmative defense on which [it] bears the burden of proof—is not appropriate" at the motion to dismiss stage of this action (Villar, 28 NY3d at 80-81, citing Valdez v City of New York, 18 NY3d 69, 79-80 [2011]).

Accordingly, the order of the Appellate Division should be reversed, with costs,

and the motion of defendant Cayuga County to dismiss the complaint denied.

SINGAS, J. (dissenting):

Born from the desire to protect those most vulnerable among us and in response to the horrific facts of this case, the majority has rashly enacted a staggering expansion of municipal liability. Casting aside our carefully crafted special duty doctrine, the majority gives in to the temptation to create an exception for "an especially appealing class of cases" (McLean v City of New York, 12 NY3d 194, 204 [2009]). Though the nature of the crimes committed against the plaintiff in this case must evoke compassion, it is up to the legislature, and not this Court, to make such consequential [*5]policy decisions. Because the majority ignores our special duty precedent, the principles that have guided us in reaffirming that rule, and the staggering effects of its expansion of municipal liability, I dissent.

I.

After the enactment of the Child Victims Act (CVA), plaintiff commenced the instant action against defendant Cayuga County (County) and several unnamed defendants. Plaintiff asserted a single claim of negligence against the County, alleging that, after being placed into a foster home, she was sexually abused and assaulted by her foster father beginning in 1975 when plaintiff was eighteen months old and continuing until 1982 when she was eight years old. The County moved to dismiss the complaint on the ground that plaintiff failed to establish that the County owed her a special duty. In opposition, plaintiff argued that the County voluntarily assumed a duty to her and, therefore, owed her a special duty.

Supreme Court denied the motion, but the Appellate Division reversed (see 216 AD3d 1459 [4th Dept 2023]). The Appellate Division, relying on this Court's precedent, held that the County's alleged failure to meet its obligations under the Social Services Law did not give rise to a special duty, because "the failure to perform a statutory duty, or the negligent performance of that duty, cannot be equated with the breach of a duty voluntarily assumed" (id. at 1462 [alterations omitted]). We granted plaintiff leave to appeal (see 41 NY3d 908 [2024]).

II.

As a threshold issue, plaintiff failed to preserve the argument endorsed by the majority—that she was not required to establish a special duty, and that the County owed her a common-law duty instead. In response to the County's motion to dismiss, plaintiff argued only that the County owed her a special duty, and cited the County's status as her legal guardian as a basis for finding that special duty. Plaintiff never argued that she could sidestep the special duty framework. The majority's artful characterization of plaintiff's argument, i.e., that a "duty arose from its 'custodial relationship' with plaintiff" (majority op at 2-3), omits this key context from her opposition papers.

Nor did Supreme Court find that plaintiff had pleaded such a common-law duty. The majority mischaracterizes Supreme Court as having decided that "because plaintiff was in the custody of the County, the case was distinguishable from Maldovan v County of Erie (188 AD3d 1597 [4th Dept 2020], affd 39 NY3d 166 [2022])," where we held that the plaintiff's claim failed under the special duty framework. To the contrary, Supreme Court explained that the "facts" of this case "are distinguish[able] from those of Maldovan" (emphasis added). This discussion, if anything, reinforces that Supreme Court analyzed the issue in the only manner that plaintiff chose to present it—within the special duty framework.

Yet plaintiff now advances a different argument: that she need not demonstrate a special duty at all. Instead, she contends that the County owed her a common-law duty of care because she was in its custody as a foster child. Because plaintiff failed to make that argument before Supreme Court, this Court has no power to reach the issue (see Sabine v State of New York, — NY3d &mdash, 2024 NY Slip Op 06288, *1-2 [2024]; cf. Maldovan, 39 NY3d at 171).

III.

In any event, our precedent is clear that a plaintiff suing a municipality for the negligent performance of its governmental functions must establish a special duty under one of the recognized categories (see Pelaez v Seide, 2 NY3d 186, 199-200 [2004]). Today the majority ignores our precedent, which squarely rejects the recognition of duties outside of that framework under these circumstances, and adds an asterisk to the special duty rule, opening municipalities to liability for a new class of plaintiffs: every child under the age of 18 in the foster care system. Doing so comes at significant financial and operational cost to local governments, and may worsen outcomes for children in foster care. The majority has created expansive liability for all municipalities operating a foster care system based on the concept of "legal," as opposed to physical, custody. And foster children are in the municipality's legal custody 24 hours a day, seven days a [*6]week, year in and year out, despite being in the physical custody of a foster family. It is up to the legislature—and not this Court—to reorder municipal liability on this scale.

A.

In 1929, New York waived immunity from liability through the Court of Claims Act (see Court of Claims Act former § 12-a, now § 8), permitting individual suits against the State and its subdivisions (see Bernardine v City of New York, 294 NY 361, 365 [1945]). However, "other recognized limitations still govern the tort liability of municipal officers, and governmental defendants unquestionably continue to enjoy a significant measure of immunity" (Ferreira v City of Binghamton, 38 NY3d 298, 308 [2022] [internal quotation marks, citation, and ellipsis omitted]). In particular, if a governmental entity was acting in its "governmental capacity" when a claim arose, a plaintiff bringing a negligence claim may not simply rely on the breach of a duty owed to the public generally. Rather, a plaintiff must establish that the government owed them a "special duty," i.e., a "duty to use due care for the benefit of particular persons" (Motyka v City of Amsterdam, 15 NY2d 134, 139 [1965]) that is "more than that owed the public generally" (Lauer v City of New York, 95 NY2d 95, 100 [2000]). Such a special duty is "born of a special relationship between the plaintiff and the governmental entity" (Pelaez, 2 NY3d at 198-199). This special duty rule has a long history in our jurisprudence.

In Steitz v City of Beacon, this Court held that there was an important distinction between a duty owed to the public and that owed to a particular individual (295 NY 51 [1945]). There, the plaintiffs alleged that the city's failure to create a fire department or maintain certain infrastructure caused their property to be destroyed in a fire (id. at 54). The Court determined that the laws governing the city's conduct at issue "were not in terms designed to protect the personal interest of any individual and clearly were designed to secure the benefits of well ordered municipal government enjoyed by all as members of the community" (id. at 55). Because the city owed no special duty, the plaintiffs were not entitled to recover for the city's failure to adhere to those laws (id.).

In Riss v City of New York, this Court similarly held that the city owed no special duty to an assault victim who, prior to the assault, had alerted the police that the assailant was threatening her (see 22 NY2d 579, 581-582 [1968]). The Court noted that "proclaim[ing] a new and general duty of protection in the law of tort . . . would inevitably determine how the limited police resources of the community should be allocated and without predictable limits" (id. at 582). This sort of "judicial innovation," the Court warned, would constitute "an assumption of judicial wisdom and power not possessed by the courts" (id.).

This Court again affirmed the distinction between liability to the public generally and to a particular individual in O'Connor v City of New York (see 58 NY2d 184 [1983]). In that case, a city inspector certified that a newly installed gas system complied with certain safety regulations, but failed to correct defects that caused an explosion resulting in deaths and injuries. Although it was "beyond dispute that the city inspector should not have" certified that the system was in compliance, the Court held that the municipality could not be held liable because the safety regulations in question were intended to "protect[ ] all members of the general public similarly situated" (id. at 189-190). Once again, the Court warned that diverging from our special duty precedent would "subject municipalities to open-ended liability of enormous proportions and with no clear outer limits" (id. at 191).

Over time, this Court identified three narrow circumstances in which a special relationship can be formed:

"(1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; or (3) when the municipality assumes positive direction and control in the face of a known, blatant and dangerous safety violation" (Pelaez, 2 NY3d at 199-200).

We have repeatedly reiterated this three-pronged framework (see Maldovan, 39 NY3d at 171; Ferreira, 38 NY3d at 310; Tara N.P. v Western Suffolk Bd. of Coop. Educ. Servs., 28 NY3d 709, 714 [2017]; Applewhite v Accuhealth, Inc., 21 NY3d 420, 426 [2013]; Metz v State of New York, 20 NY3d 175, 180 [2012]; McLean, 12 NY3d at 199; Kovit v Estate of Hallums, 4 NY3d 499, 506 [2005]). As we recently explained, "the special duty requirement applies to all negligence actions against a governmental defendant" acting in its governmental capacity (Ferreira, 38 NY3d at 316 [emphasis added]).

We have maintained that, absent a special duty, "there should be a legislative determination" of "the scope of public responsibility" (Riss, 22 NY2d at 582; see Kircher v City of Jamestown, 74 NY2d 251, 259 [1989]; O'Connor, 58 NY2d at 192 ["If liability to individuals is to be imposed on municipalities for failure to enforce statutes or regulations intended for the general welfare, that imposition should come from the (l)egislature"]; Steitz, 295 NY at 55 ["An intention to impose upon the city the crushing burden of such an obligation should not be imputed to the (l)egislature in the absence of language clearly designed to have that effect"]). Our special duty case law sets the outer bounds of governmental liability under the common law, and we have left it for the political branches to further extend this liability.

B.

Consistent with this history, we have rejected the expansion of the special duty doctrine in strikingly similar circumstances. In McLean, a child was injured at a daycare facility that was required to register with the State Department of Social Services and, as in this case, was subject to municipal oversight under article 6 of the Social Services Law (see 12 NY3d at 197). The defendant, the City of New York, did not have physical custody or control over the children at the daycare center, like the County here. While at the daycare, the child fell and suffered a brain injury (see id. at 199). The Court concluded that the plaintiff failed to demonstrate that the City owed her a duty specifically, rather than the general duty the City owed to all parents and children in need of daycare (see id. at 201-202). Thus, the plaintiff failed to establish a special duty between the child and the City. The Court further held that recognizing a private right of action under the Social Services Law, where the statute provided none by its terms, "would be inconsistent with the legislative scheme" (id. at 200).

Like the children in daycare in McLean, the County's duty to plaintiff "was neither more nor less than its duty to any other . . . child in need of" foster care (id. at 201). Yet the majority fails to appreciate this distinction between liability to the public generally and liability to a particular individual—the key distinction that has animated the special duty doctrine since its inception. Like in McLean, a carefully calibrated legislative and regulatory scheme governs the municipal conduct at issue here, including by vesting legal custody over foster children to the municipality (see Social Services Law § 383 [2]). That scheme is not designed "to protect the personal interest of any individual," but rather "clearly [was] designed to secure the benefits of well ordered municipal government enjoyed by all as members of the community" (Steitz, 295 NY at 55). Indeed, the statutes and regulations governing foster care "protect[ ] all members of the general public similarly situated," and thus, there is no basis for municipal liability (O'Connor, 58 NY2d at 190).

In addition to being incompatible with our precedent, imposing novel liability in this circumstance is also inconsistent with the Social Services Law, as we again squarely held in McLean (see 12 NY3d at 200-201, citing Mark G. v Sabol, 93 NY2d 710, 720-721 [1999]). Because the legislature "specifically considered and expressly provided for enforcement mechanisms" in the laws governing provision of foster care, and those laws "were enacted as the 'comprehensive' means by which the statute accomplishes its objectives," it is "inappropriate for [this Court] to find another enforcement mechanism beyond the statute's already 'comprehensive' scheme" (Mark G., 93 NY2d at 720). Critically, the legislature saw fit to create a private right of action under Social Services Law § 420, which "provides for criminal and civil liability for the willful failure of persons, officials or institutions required by title 6 to report cases of 'suspected child abuse or maltreatment' " (id. at 722 [emphasis added], quoting Social Services Law § 420). "If the [l]egislature had [*7]intended for liability to attach for [negligent] failures to comply" with the statutes at issue here, "it would likely have arranged for it as well" (id.).

McLean is on all fours in yet another respect: in it we rejected the very same theory of common-law duty on which the majority's holding now rests. The plaintiff there asserted that this Court should recognize "a new category" that included her and the City, and that she could thus prevail "without fitting her case into . . . a [special duty] category" (12 NY3d at 202). She also contended that the "City should stand liable at common law for its plainly negligent performance of admittedly ministerial functions" (brief for respondent at 60 in McLean, 12 NY3d 194 [emphasis omitted]). The plaintiff's argument in part derived from the public policy concern "that the helplessness of young children, and the State's powerful interest in protecting them from neglect or abuse, should lead [the Court] to announce the existence of a special relationship between those who register child care providers and parents and children who need child care" (McLean, 12 NY3d at 204). This Court declined this "invitation to relax the special relationship rule to accommodate an especially appealing class of cases," explaining that "[a] well settled rule of law denies recovery in cases like this, and that rule, by its nature, bars recovery even where a government blunder results in injury to people deserving of the government's protection" (id.). Properly applied, McLean forecloses any argument that the County owed plaintiff a duty here.

C.

Notwithstanding, today's ruling disregards our foreboding warnings against expanding the special duty doctrine. Here too, plaintiff urges this Court to create a new special duty category for her case. Instead of exercising the restraint consistently reflected throughout our precedent, the majority accepts plaintiff's invitation, creating uncertainty where this Court has made concerted efforts to establish consistency. In abandoning this precedent, the majority holds that municipalities owe "a duty of care to the children the municipalities place in foster homes because the municipalities have assumed custody of those children" (majority op at 1). This sweeping rule suggests that the government would be liable for any harm that a foster child suffers—all the liability associated with physical custody without the same control over the environment.

Attempting to sidestep McLean, the majority insists that its decision "simply acknowledges and gives meaning to our governmental custody line of cases," by extending their holdings to those in the government's "legal custody," including those in foster care (majority op at 8).[FN8] In the cases the majority cites (see e.g. Sanchez v State of New York, 99 NY2d 247 [2002]; Mirand v City of New York, 84 NY2d 44 [1994]; Pratt v Robinson, 39 NY2d 554 [1976]; Flaherty v State, 296 NY 342 [1947]), the Court determined that the State owed a duty of care to those in its physical custody, including incarcerated individuals (see Sanchez, 99 NY2d at 252) and students while at school (Pratt, 39 NY2d at 560), because of the nature of the custody.

Despite the majority's protestations, our physical custody cases are inapplicable for the obvious reason that plaintiff was not in the County's physical custody when the alleged incidents occurred. Our physical custody precedent makes sense: the government exercises a high level of control over an individual in its physical custody. As we explained in Pratt v Robinson,

"[t]he duty owed by a school to its students . . . stems from the fact of its physical custody over them. As the Restatement puts it, by taking custody of the child, the school has 'deprived [the child] of the protection of his parents or guardian. Therefore, the actor who takes custody of a child is properly required to give him the protection which the custody or the manner in which it is taken has deprived him' " (39 NY2d at 560 [emphasis added], quoting Restatement [Second] of Torts § 320, Comment b).

Notably, Pratt recognized that "[w]hen [physical] custody ceases because the child has passed out of the orbit of its authority in such a way that the parent is perfectly free to reassume control over the child's protection, the school's custodial duty also ceases" (id.). Similar to students leaving the "orbit" of a school, municipalities relinquish day-to-day physical custody and control of foster children when they are placed with foster parents, even if municipalities retain legal custody.

Here, no one disputes that foster children are not in the government's physical custody. Rather, "foster parents are responsible for making routine day-to-day decisions about things like play dates or school trips, assisting with homework and other school activities, and taking children to medical appointments" (brief for amicus curiae City of New York at 5). Consequently, a municipality does not decide how a foster child's daily needs are met, but rather performs the more limited role of oversight and enforcement. Enforcing regulations enacted to help ensure that foster children receive the care they need is not the same as caring for foster children in the first instance. Without municipalities having that level of control, this Court is exposing municipalities to a wide array of negligence claims that extend beyond the sympathetic facts of this case. Municipalities may now have to monitor foster children 24 hours a day in response to such a duty. As a result, the majority's troublesome expansion of our physical custody cases goes far beyond merely "acknowledg[ing] and giv[ing] meaning to our governmental custody line of cases" (majority op at 8).

The majority instead ignores that the foster parents had physical custody of plaintiff here. While in this case a foster parent was allegedly the bad actor, that allegation alone does not change that bad actors are sometimes the only ones who can be held legally responsible for their actions. Moreover, the majority seems to criticize the entire foster care system without recognizing that most foster parents are loving and caring, and often offer welcome refuge to a child in danger.

The majority's holding also overlooks that municipalities are not solely responsible for placing and removing foster children. Except in emergency situations, a Family Court judge decides whether to remove a child from a home (Family Court Act §§ 1022, 1024, 1027 [a] [iii]; see brief for amicus curiae City of New York at 5).[FN9] If there is a finding of abuse or neglect against the child's guardian, a Family Court judge then renders an order of disposition determining where the child will live (see Family Court Act § 1052), which could result in the child being placed in foster care by court order (see id. § 1055 [a] [i]). Notwithstanding the court's integral role in this process—and localities' obligation to implement court orders placing children into foster care—the majority makes municipalities liable for such placements' consequences.

Ultimately, the majority leaves the lower courts to speculate what other duties the government might owe to those in its "legal custody." For example, "[a] person who is under a sentence of probation is in the legal custody of the court that imposed it pending expiration or termination of the period of the sentence" (CPL 410.50 [1] [emphasis added]). Likewise, parolees are "in the legal custody of the [Department of Corrections] until expiration of the maximum term or period of sentence, or expiration of the period of supervision, including any period of post-release supervision, or return to imprisonment in the custody of the department" (Executive Law § 259-i [2] [b] [emphasis added]). This potential for broad new liability [*8]highlights why this Court has consistently forbidden making "ad hoc exceptions to the special duty/special relationship rule" (McLean, 12 NY3d at 204).

The majority compounds this confusion by failing to explain its rejection of the County's governmental function immunity defense (majority op at 13). The County will undoubtedly continue to assert this defense in this litigation. But by omitting any discussion of how this crucial step of the governmental liability analysis interacts with its novel holding, the majority has abdicated its duty to provide lower courts and litigants meaningful guidance on how to implement its decision.

D.

This Court has explained that

"the special duty rule is grounded in separation of powers concerns and a recognition that executive agencies, not the courts and juries, have the primary responsibility to determine the proper allocation of government resources and services. Indeed, the special duty rule minimizes a municipality's exposure to 'open-ended liability of enormous proportions and with no clear outer limits,' which could otherwise 'discourage municipalities from undertaking activities to promote the general welfare' that may expose them to liability. . . . [I]t is intended to allow municipalities to 'allocat[e] resources where they would most benefit the public' and ensure that 'the prime concern' is not 'the avoidance of tort liability' but 'the promotion of the public welfare' " (Ferreira, 38 NY3d at 316, quoting O'Connor, 58 NY2d at 191 [citation omitted]).

"Allowing such decisions regarding allocation of resources and services to be made by the government, and not this Court, is one of the primary reasons for the special duty rule" (Maldovan, 39 NY3d at 175 n 1).

Today, this Court, in essence, codifies a new private right of action that the legislature has heretofore declined to create.[FN10] In doing so, this Court makes the policy judgment that the government should pay for harm inflicted by third parties on foster children, without due consideration for "[t]he deleterious impact that such a judicial extension of liability would have on local governments, the vital functions that they serve, and ultimately on taxpayers" (O'Connor, 58 NY2d at 192).

As the County of Westchester highlights in its amicus curiae brief, extending liability in this manner could well generate multimillion dollar judgments against localities for the acts of third parties (see Andrew Denney, Federal Jury Awards Record Nine-Figure Verdict to Child Victims Act Plaintiff, NYLJ, Mar. 29, 2024, available at https://www.law.com/newyorklawjournal/2024/03/29/federal-jury-awards-record-nine-figure-verdict-to-child-victims-act-plaintiff/?slreturn=20241025104458 [last accessed Feb. 10, 2025] [reporting jury awards in CVA cases of $95 million, $100 million, and $160 million]). "Even if a court substantially reduced such an award, it is likely that municipalities—without the protection of the special duty rule—will be faced with multi-million dollar verdicts in a substantial number of cases" (brief for amicus curiae County of Westchester at 15 n 7). Indeed, the City of New York notes that it alone currently faces more than 600 lawsuits brought under the CVA, and that " '[i]mposing liability here' risks inflicting a [*9]'crushing burden' on child protective agencies like [New York City Administration for Children's Services]" (brief for amicus curiae City of New York at 1-2, 25 [citation omitted]). The majority ignores that such a crushing burden not only stems from potential judgments (see majority op at 12-13), but also arises from increased litigation costs. This new avenue of liability will increase the number of cases brought and force municipalities to litigate past the motion to dismiss stage. This will inevitably cause municipalities to settle meritless claims to avoid significant litigation costs and the risk of monumental judgments.

Subjecting municipalities to such "open-ended liability of enormous proportions and with no clear outer limits" will "impede municipal officials from allocating resources where they would most benefit the public" (O'Connor, 58 NY2d at 191). As a result, I fear that the majority's holding will have the unintended consequence of "discourag[ing] municipalities from undertaking activities to promote the general welfare" (id.; see Maldovan, 39 NY3d at 175 [warning that placing such a "crushing burden" may "render them less effective in fulfilling their mission to protect vulnerable individuals"]). To combat the ensuing onerous costs, municipalities will respond as they often must—by diverting precious resources from those who need them most. "[C]ourts should not take it upon themselves to, in effect, reorder municipal priorities" (O'Connor, 58 NY2d at 191).

Even more concerning, today's holding may create a perverse financial incentive to resist removing children from their abusive or neglectful families because negligence claims can now proceed if a municipality removes a child and places them with a foster family, but cannot if the municipality declines to remove a child from a dangerous home (see Maldovan, 39 NY3d at 175). Additionally, to avoid facing potentially crushing liability outside their control, municipalities may regress to placing children in institutional settings like orphanages rather than foster homes. "[P]lacements in institutional care generally have less favorable outcomes than those in family-based settings" and "often have a negative impact on children's overall development that may be serious and irreversible" (Eric Rosenthal, The Right of All Children to Grow Up with a Family under International Law: Implications for Placement in Orphanages, Residential Care, and Group Homes, 25 Buff Hum Rts L Rev 65, 90 [2019], quoting Nigel Cantwell, The Human Rights of Children in the Context of Formal Alternative Care in Wouter Vandenhole et al., Routledge International Handbook of Children's Rights Studies at 268 [2015]). This Court is distinctly ill-equipped to wade into these complex and competing policy interests—interests that the legislature has presumably balanced by choosing to enact a statutory scheme that does not impose liability on municipalities in these circumstances (see Mark G., 93 NY2d at 720, 722). I would respect that choice.

V.

Plaintiff is required to plead and prove that the County owed a special duty to her, separate from the general duty owed to the public and she has failed to meet this burden. "Special duty cases often come to us following instances of domestic violence and other 'sympathetic circumstances' where emotions are charged and our shared 'humanistic intuition' necessarily tempts us to disregard settled law in order to permit individual recovery" (Howell v City of New York, 39 NY3d 1006, 1010 [2022] [citation omitted]). "Our responsibility, however, is to set the particular case before us into its carefully developed precedential framework, mindful always of the opportunities the common law allows for refinements to assure that the rule or principle that emerges is a sound one" (Lauer, 95 NY2d at 103-104). The outcome dictated by faithfully applying our precedent here might well spark a debate over the costs and benefits of expanding municipal liability, in the proper forum with the appropriate stakeholders. Instead, the majority usurps that role, weighing policy choices and overriding precedent limiting liability in special duty cases. In doing so, it has set the stage for system-wide change, likely not of the kind, or with the salutary effects, that the majority envisions.

Order reversed, with costs, and motion by defendant Cayuga County to dismiss the complaint denied. Opinion by Judge Troutman. Chief Judge Wilson and Judges Rivera, Cannataro and Halligan concur. Judge Singas dissents in an opinion, in which Judge Garcia concurs.

Decided February 18, 2025

Footnotes

Footnote 1: Although not directly relevant to the question before us, we note our recent clarification that this third situation also includes instances where a municipality effectively takes control of a premises, thereby "knowingly creating an unpredictable and potentially dangerous condition" (Ferreira, 38 NY3d at 317 [emphasis added]).

Footnote 2: Plaintiff's argument is preserved. In an affirmation provided in opposition to the County's motion to dismiss, she argued that the County had "a duty arising from a custodial relationship," and that this duty continued after the County placed plaintiff in her foster home. In an accompanying memorandum of law, plaintiff elaborated that, because of that custodial relationship, she had adequately "allege[d] a special relationship" between the County and herself such that the duty owed to her "was more than a general duty owed to the public." She makes the same argument here. Furthermore, we and the dissenters appear to agree that Supreme Court distinguished Maldovan based on the fact that, here, plaintiff was in the custody of the County (see dissenting op at 3).

Footnote 3: The dissent relies on Mark G. (see dissenting op at 9), but that case is inapposite because there were no allegations that the government had breached a common-law duty. There, we decided only that plaintiffs, some of whom suffered abuse in the foster homes, could not allege a private right of action based on provisions of the Social Service Law (see Mark G., 93 NY2d at 720-722). However, we granted plaintiffs leave to replead any common-law claims or theories (see id. at 726-727). When we cited Mark G. in McLean, we did so only with respect to our discussion concerning the statutory duty category of the special duty doctrine (see McLean, 12 NY3d at 200-201). The holding of Mark G. therefore remains cabined solely to alleged breaches of statutory duty and does not extend to common-law negligence claims.

Footnote 4: We do not consider the question of whether a special duty arises when legal custody is vested with a non-government official.

Footnote 5: We are puzzled by our dissenting colleagues' reliance on our "carefully crafted special duty doctrine" yet insistence that only the legislature can recognize a duty on the part of municipalities under these circumstances (dissenting op at 1). Indeed, the special duty doctrine itself was not the result of legislative judgment but instead is a creature of common law (see Maldovan, 39 NY3d at 174). Further puzzling is our dissenting colleagues' emphasis that the " 'comprehensive' scheme" of the Social Services Law precludes this Court from recognizing a duty that may create liability for a municipality's negligence (dissenting op at 9, quoting Mark G., 93 NY2d at 720). While the dissent claims that "[t]his Court is distinctly ill-equipped to wade into these complex and competing policy interests" (dissenting op at 17-18), it appears willing to impose such liability where a plaintiff otherwise satisfies one of the special duty categories, which were crafted from the policy decisions of this Court. Our decision is not, as the dissent suggests, merely "[b]orn from the desire to protect those most vulnerable among us and in response to the horrific facts of this case" (dissenting op at 1). We simply apply the longstanding doctrine concerning persons in government custody.

Footnote 6: We respectfully disagree our dissenting colleagues' accusation that our decision "criticize[s] the entire foster care system without recognizing that most foster parents are loving and caring, and often offer welcome refuge to a child in danger" (dissenting op at 13). We have no doubt that the majority of municipal actors and foster parents provide foster children with invaluable care and protection. Our decision merely allows the opportunity to recover for foster children who suffer harm in the care and custody of bad actors where the government could have reasonably foreseen such harm. In this respect, our decision does not hold municipalities liable for the actions of bad actors. Indeed, plaintiff may be unable to establish any negligence by the County even if the she suffered the grievous injuries of which she has complained.

Footnote 7: Municipal liability would not foreclose an action against the foster parent for potential liability based on their acts.

Footnote 8: The majority's legal analysis is not entirely consistent or clear. Is this new duty owed to those in the government's legal custody based on (1) common-law liability, "fall[ing] outside the special duty doctrine" (majority op at 8); or (2) the voluntary assumption of a duty (see majority op at 9 ["By assuming custody of plaintiff, and thus assuming the authority to control where and with whom plaintiff lived, the County necessarily assumed a duty to her beyond what is owed to the public generally"])?

Footnote 9: "[I]f the court finds that removal is necessary to avoid imminent risk to the child's life or health, it is required to remove or continue the removal and remand the child to a place approved by the agency" (Nicholson v Scoppetta, 3 NY3d 357, 376-377 [2004], citing Family Court Act § 1027 [b] [i]). "In undertaking this inquiry, the statute also requires the court to consider and determine whether continuation in the child's home would be contrary to the best interests of the child" (id.).

Footnote 10: I would adhere to this Court's precedent consistently holding that only the legislature may expand liability beyond the special duty framework (see Kircher, 74 NY2d at 259; O'Connor, 58 NY2d at 192; Riss, 22 NY2d at 582; Steitz, 295 NY at 55). Stare decisis dictates that "common-law decisions should stand as precedents for guidance in cases arising in the future and that a rule of law once decided by a court, will generally be followed in subsequent cases presenting the same legal problem" (Matter of State Farm Mut. Auto. Ins. Co. v Fitzgerald, 25 NY3d 799, 819 [2015] [internal quotation marks omitted]). Substituting their own policy judgments for our precedent, the majority ignores this important prudential limitation on exercising our authority to change the common law (see majority op at 8 n 5). I "do not blithely decline to amend the common-law rule in this case without reason" (Maldovan, 39 NY3d at 174). Rather, I am bound to adhere to our precedent.